**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-6616

RICHARD A. NICOLAS,

Petitioner - Appellee,

v.

THE ATTORNEY GENERAL OF THE STATE OF MARYLAND; RICHARD GRAHAM, Warden,

Respondents - Appellants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:06-cv-02637-RDB)

Argued: March 22, 2016               Decided: April 27, 2016

Before NIEMEYER and MOTZ, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

Reversed by published opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Cogburn joined.

**ARGUED**: Edward John Kelley, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Geoffrey Robert Garinther, VENABLE LLP, Baltimore, Maryland, for Appellee. **ON BRIEF**: Brian E. Frosh, Attorney General of Maryland, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Matthew P. Reinhart, VENABLE LLP, Baltimore, Maryland, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

In 1997, a Baltimore City jury convicted Richard Nicolas of murdering his infant daughter. Years later, Nicolas sought habeas relief, arguing that the State failed to disclose favorable, material evidence in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963). The Maryland post-conviction courts considered and rejected his Brady claim. Nicolas then petitioned for a writ of habeas corpus in federal court, which the district court granted. Given the deference that federal law requires to state court judgments in such cases, we must reverse.

## I.

### A.

On July 26, 1996, two-year-old Aja Nicolas was shot and killed while visiting with her father, Richard Nicolas. Aja lived with her mother. Nicolas had picked her up that Friday evening with plans to see a movie at a local mall. Nicolas bought a ticket for the movie Pinocchio, and before the movie he and Aja took a photo booth picture together. The movie ended around 9:45 P.M.

According to Nicolas, things went horribly wrong on the drive back to Aja's mother's home. Nicolas told police that a car started following closely behind him and "driving crazy." When Nicolas turned off onto Bowley's Lane, the erratic car followed and bumped his vehicle. Nicolas told police that he then stopped

2

and got out to confront the other driver.  While Nicolas was walking around his vehicle, he heard a gunshot and saw the other car drive off.

Seeing Aja slumped over in her seat, Nicolas assumed she had been shot and ran to a nearby convenience store to call for help. In response, Officer Fred Hannah arrived at the convenience store just minutes later, around 10:00 P.M.  He and Nicolas then returned to the car and found Aja dead.  Officer Hannah and Nicolas removed Aja from the car and laid her on her back.  She had been shot in the head on the left side of her face.

The State did not believe Nicolas's story.  Its theory of the case was that, after obtaining the photo booth picture, Nicolas himself shot Aja.  According to the State, Nicolas then left Aja laying on her side in the car and went to see the 8:00 P.M. Pinocchio showing alone.  The State argued that after the movie, Nicolas drove to Bowley's Lane, ran to the convenience store, and fabricated the tale of the rogue aggressive driver.

The State presented its largely circumstantial case over a fourteen-day trial.  It argued that Nicolas never wanted to take responsibility for Aja, the product of a one-night stand, and had even asked Aja's mother to obtain an abortion.  Nicolas, because he was behind in court-ordered child support, was having his wages garnished and yet had recently obtained life insurance for Aja. In response, Nicolas offered evidence that the Gerber life

3

insurance policy he purchased was marketed as a way to save for a child's future, and that he had become more involved in Aja's life as she grew older.

Additionally, the State emphasized that Nicolas was a gun enthusiast who previously owned the type of weapon and ammunition used to kill Aja. The State never found the murder weapon, however, nor directly connected any of Nicolas's guns or ammunition to the murder.

Several witnesses testified for the State that Nicolas's demeanor was very calm on the night of the murder, unlike that one would expect from a father whose toddler had just been murdered. Nicolas's explanation was that he has a debilitating stutter that requires him to calm himself, or else he is completely unable to speak. The State also highlighted inconsistencies in Nicolas's story, the gunshot residue (a small amount) found on Nicolas's left hand, and the improbability of the shooting occurring the way Nicolas claimed.

The State's strongest evidence was testimony from the medical examiner on lividity, i.e., how the blood settled in Aja's body. Because lividity was fixed on her back and her left side, the medical examiner, Dr. Dennis Chute, opined that Aja must have died about two hours before Nicolas and Officer Hannah moved her onto her back. Otherwise, the blood would not have had time to settle on her side. Nicolas argued that, as the State's forensic

4

investigator noted in her report, Aja was still warm and rigor mortis had not yet set in when the police arrived. Still, Nicolas's main response to Dr. Chute's expert opinion was simply his own testimony: that Dr. Chute must be wrong because Nicolas was there and knew the shooting occurred at around 9:45 P.M. In closing, the State emphasized that Nicolas could not "get past the issue of lividity." The jury convicted Nicolas in less than three hours.

## B.

Nicolas appealed, and in 1998 the Court of Special Appeals of Maryland affirmed his conviction. Nicolas then filed a state petition for post-conviction relief. In 2005, the Circuit Court for Baltimore City denied relief, and the Court of Special Appeals summarily denied leave to appeal that ruling.[1]

Nicolas then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Maryland. Through a Maryland Public Information Act request, his appointed counsel obtained police notes detailing two potential witnesses who authorities had interviewed during their investigation of Aja's death. One of the

---

[1] Nicolas alleged prosecutorial misconduct related to the gunshot residue evidence and three ineffective assistance of counsel claims for failure to strike a juror, for failure to rebut the state expert's lividity testimony, and for requesting an erroneous jury instruction.

witnesses had contacted police claiming to have "information about [the] killing of [the] two year old."  The potential witnesses had been staying at a Holiday Inn about one-eighth of a mile from Bowley's Lane, where Aja was found dead.  They both told police that they had heard a loud noise -- that sounded like a gunshot or a car backfiring -- on the night of Aja's death.

After speaking to the first potential witness, Jennifer McKinsey, investigators wrote:

> She advised that she was going to her vehicle and observed a small vehicle at the bottom of the hill.  As she was entering her vehicle she hers [sic] a loud popping sound like a gun shot.  Mrs. McKinsey advises as she was exiting the parking lot the car sped off.

Police also recorded an interview with the second potential witness, Richard Benson, and summarized it as follows:

> Mr. Benson advises at approximately 10:00 P.M. he left out of the hotel to go to his vehicle which was parked on the hotel parking lot.  [T]he witness states when he arrived at his vehicle he observed a light colored vehicle parked in the 6500 block of Frankford Ave., the vehicle appeared to have it's [sic] engine running and the dome light on inside.  Mr. Benson states as he entered his vehicle he heard a loud noise like the car back fired [sic], at this time the vehicle sped off.

Benson described the noise as "a pretty loud bang."  Prior to the Public Information Act request, the State had not disclosed to Nicolas the existence of these potential witnesses.  Because Nicolas had not presented these documents to the state court, he filed a motion to reopen state post-conviction proceedings.  The

6

district court stayed Nicolas's federal habeas proceedings while he exhausted state remedies.[2]

Back in state court, Mr. Nicolas argued that the State's failure to disclose the witness statements violated Nicolas's rights under Brady v. Maryland, 373 U.S. 83 (1963). In 2010 the Circuit Court for Baltimore City denied the motion to reopen, finding that the statements were not favorable to Nicolas. It summarized the arguments on both sides and found:

> [T]hese witnesses would have given testimony that, at best, conflicted with the theory of the case advanced by the Petitioner. Indeed, arguably the statements by the witnesses were more consistent with the State's theory of the case than the defense.

The Court of Special Appeals summarily denied Nicolas leave to appeal, and he returned to federal court for habeas review. The district court conducted an in camera review of the State's file, which led to additional discovery. In particular, the file contained two letters written by the trial prosecutors to Officer Hannah and Dr. Chute. The prosecutors thanked Officer Hannah for moving Aja, although it had been a violation of police protocol, writing:

---

[2] Appointed counsel also obtained information that related to Nicolas's original post-conviction claims. Counsel interviewed Dr. Chute and obtained a letter from him explaining that lividity by itself is unreliable for determining time of death. Additionally, counsel argued that, based on new developments in gunshot residue analysis, the evidence used to convict Nicolas was no longer accepted by the scientific community.

Had you left her in the car, we would never have won this case. It is only because you did move her that the Medical Examiner saw the fixed lividity on her left side and her back when the autopsy was done. This fact was the whole case. Lividity made everything Nicolas said a boldfaced lie.

In their letter to Dr. Chute, the prosecutors similarly emphasized the importance of the lividity testimony, explaining:

> The jury was only out for two hours, which is a very short time considering that the trial lasted for fourteen days. We are 100% certain that your testimony was the reason that this jury had no difficulty reaching this verdict.

Although these letters, written post-trial, could not be Brady evidence, the district court stayed the proceedings before it so that the state court could consider the witness statements in light of these newly revealed letters. In 2013, the Circuit Court for Baltimore City again denied Nicolas's motion to reopen post-conviction proceedings. It explicitly adopted the 2010 court's favorability analysis rejecting Nicolas's claim. Additionally, it rejected the argument that the witness statements were material to the outcome of the trial, even in light of the prosecutors' letters, holding:

> The Court finds the evidence cited by the State to be compelling. In contrast, the additional material disclosed in the U.S. District Court proceeding merely demonstrates a diligent investigation by the Baltimore City Police Department. Furthermore, much of the other non-disclosed interviews and statements contradict Petitioner's theory of defense or are otherwise damaging to him, and would certainly not rise to the level where they resulted in a verdict that is not worthy of confidence.

8

The Court of Special Appeals once more denied leave to appeal, this time including a three-page opinion addressing only the impact the prosecutors' letters had on its materiality analysis, explaining:

> All that these letters show is that the prosecuting attorneys believed that the evidence of the time of death was crucial to the State's case. The letters do not, in light of all the evidence introduced at trial, render the undisclosed statements material. Therefore, we hold that the non-disclosure did not amount to a discovery violation or warrant post-conviction relief.

The Court of Appeals of Maryland denied Nicolas's petition for certiorari, and Nicolas returned once again to federal court for an adjudication on the merits of his updated § 2254 petition. Nicolas's petition included four claims: ineffective assistance of counsel relating to the lividity evidence; ineffective assistance of counsel relating to a jury instruction; a challenge to the use of gunshot residue evidence; and the Brady claim.

The district court rejected most of Nicolas's claims, but granted relief on the Brady claim. Regarding favorability, the district court found that the state court had based its holding on an unreasonable determination of the facts, explaining:

> Evidence suggesting that the fatal shot was fired around 9:45 p.m. would have contradicted the State's theory and supported Petitioner's version of events. As such, there was absolutely no basis for the state courts to conclude that the suppressed statements conflicted with Petitioner's theory of the case.

9

Similarly, the district court found that the state court unreasonably applied Brady in holding that the statements were not material, reasoning:

> The improper consideration of only the prosecution's evidence led the state courts to the irrational conclusion that the statements were not material. While a review of the record makes abundantly clear that the crux of the case against Petitioner was the lividity testimony concerning the time of death, the import of that evidence was all the more obvious in this case: there is written acknowledgement by the trial prosecutors in this case that Dr. Chute's lividity testimony was 'the whole case.' For the state courts to have suggested otherwise is simply unreasonable and inaccurate.

For these reasons, the district court vacated Nicolas's conviction and remanded for a new trial. The court stayed its order to provide the State an opportunity to appeal. The State timely noted this appeal; Nicolas did not cross-appeal the court's rejection of his other claims.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a federal court reviewing a habeas petition that has already been adjudicated on the merits in state court to give considerable deference to the state court decision. A federal court may not grant habeas relief unless the state court arrived at "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

10

the Supreme Court of the United States," or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2012).

We must presume that the state court's factual findings are correct unless the petitioner rebuts those facts by clear and convincing evidence. § 2254(e)(1). Importantly, we cannot disturb the state court's ruling simply because it is incorrect; it must also be unreasonable. Harrington v. Richter, 562 U.S. 86, 100-01 (2011). We "look through" the Court of Appeals of Maryland's summary denial of Nicolas's petition for certiorari and evaluate the last reasoned state court decisions rejecting the Brady claim. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015).

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Therefore, a Brady violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial. Monroe v. Angelone, 323 F.3d 286, 299 (4th Cir. 2003). In determining what prosecutors must disclose, we make no distinction between exculpatory and impeachment evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). Both information that

11

undermines the prosecution's case and information that supports the defendant's case constitute Brady material that must be disclosed.

We review the district court's decision de novo, deciding through AEDPA's deferential lens whether Nicolas's Brady claim meets the requirements to warrant a new trial. Lewis v. Wheeler, 609 F.3d 291, 300 (4th Cir. 2010). The parties agree that the State did not disclose Benson and McKinsey's statements to Nicolas until years after trial. As a result, only the favorability and materiality of those statements are at issue.

III.

Assuming without deciding that the suppressed statements were favorable to Nicolas, the State violated Brady only if the witness statements were also material to the outcome of the trial. See Wolfe v. Clarke, 691 F.3d 410, 424 (4th Cir. 2012). Materiality "is not a sufficiency of the evidence test," and a defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles v. Whitley, 514 U.S. 419, 434–35 (1995). Nevertheless, a defendant claiming a Brady violation must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

12

In this case, the Circuit Court for Baltimore City did not catalogue all of the evidence offered by Nicolas at trial. But the court did expressly explain that it had considered "the record as a whole" and found that the "undisclosed" witness statements were "not material." The Court of Special Appeals of Maryland, in briefly responding to the prosecutors' post-trial letters -- which emphasized the importance of the lividity evidence -- similarly noted that the letters did not "render the undisclosed statements material."[3] A federal court can grant relief under § 2254 only if "the state court's ruling" was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Nicolas argues that in rejecting his Brady claim the state court ignored the exculpatory value of the statements -- in corroborating his own testimony as to the time of death -- and their impeachment value -- in contradicting Dr. Chute's time of death estimate. The State maintains that the statements are

---

[3] Ordinarily we would focus on one state court decision. In this case, however, the Court of Special Appeals discussed only the prosecutors' letters, without commenting on the Circuit Court's analysis of the undisclosed statements. Thus we assume the Court of Special Appeals adopted the Circuit Court's reasoning. "[S]ilence implies consent, not the opposite -- and courts generally behave accordingly, affirming without further discussion when they agree, not when they disagree, with the reasons given below." Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991).

immaterial because they "describe a set of events completely unrelated to Nicolas's account of Aja's murder." State Br. 28.[4]

We recognize that had Benson and McKinsey testified, they might have done so in a way that helped Nicolas. They could have said that they heard a gunshot around 9:45 P.M. on the night of the murder. They could have testified that the sound of the gunshot came from Bowley's Lane, where the police found Aja's body. Of course, the State could have cross-examined them with their original statements, in which both witnesses associated the noise with a car in a cul-de-sac that was <u>not</u> on Bowley's Lane. Moreover, the defense would have to deal with Benson's original statement that the noise was not a gunshot at all, but rather a car backfiring. And critically, the defense would still be confronted with Dr. Chute's testimony that in his expert opinion Aja had been dead for about two hours at the time Benson and McKinsey heard a noise.

Thus, in this hypothetical trial, the jury would have to decide whether Benson and McKinsey actually heard a gunshot or

---

[4] In its Reply Brief, the State also suggests that the statements cannot be considered impeachment evidence because they would not be admissible as such under state evidence rules. We reject this argument. <u>Brady</u> material does not have to be admissible under state evidence rules as long as it could lead to admissible evidence. <u>See, e.g.,</u> <u>Kyles</u>, 514 U.S. at 428-32, 445-51, 454 (holding that undisclosed information relating to a non-testifying informant was <u>Brady</u> material). In this case, knowledge of the statements could have led to admissible evidence.

14

whether they were mistaken and heard a car backfiring or some other noise. Further, even if the jury believed Benson and McKinsey had heard a gunshot, the jury would also have to decide whether the sound came from Bowley's Lane rather than from the cul-de-sac the witnesses had originally believed to be the site of the noise. And to reject the State's theory as to the time of death, the jury would have to believe that this new testimony, combined with the limited other evidence Nicolas offered concerning time of death, was enough to undermine the largely uncontradicted expert testimony on lividity.

Considering these inconclusive suppressed statements with the record as a whole, reasonable jurists could well conclude that the statements did not "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435. Although Nicolas vigorously contested the State's other evidence and offered evidence in his defense -- including his own testimony -- the jury had no apparent difficulty rendering its verdict. The undisclosed witness statements undermine only the State's time of death theory -- and that only if we assume the jury would have resolved each of the conflicting inferences noted above in Nicolas's favor. As the State maintains, the jury could have found the witness statements altogether irrelevant. In any event, it was not unreasonable for the state courts to conclude

15

that, when considered with all the other evidence offered at trial, the statements would have made no difference to the verdict.

This is not to say that the district court's disapproval of the prosecution's failure to produce the witness statements prior to trial is not entirely understandable. It is always better practice for the prosecution to disclose potentially favorable information before trial. Only this practice ensures the fair trial that our justice system aspires to provide all persons. Only this practice avoids the need for courts to determine the value of evidence in a hypothetical world. If prosecutors follow this practice, no one has to worry after the fact whether the jury convicted the wrong person.

But as explained above, it was not unreasonable for the state courts to reject Nicolas's Brady claim. Congress, in passing AEDPA, does not permit a federal court to replace a state court's judgment with its own. Rather, as the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102.

IV.

For the reasons set forth above, the judgment of the district court is

REVERSED.

16