**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4008**

UNITED STATES OF AMERICA,

Plaintiff – Appellant,

v.

GERMAINE CANNADY,

Defendant – Appellee.

**No. 17-4202**

UNITED STATES OF AMERICA,

Plaintiff – Appellant,

v.

GERMAINE CANNADY,

Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge.  (1:14-cr-00389-RDB-2)

Argued:  December 7, 2017                    Decided:  March 9, 2018

Before WILKINSON and DIAZ, Circuit Judges, and SHEDD, Senior Circuit Judge.

Reversed and remanded by unpublished per curiam opinion.

––––––––––––––

**ARGUED:** Christopher John Romano, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant. Richard Samuel Stolker, UPTOWN LAW LLC, Rockville, Maryland, for Appellee. **ON BRIEF:** Stephen M. Schenning, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant.

––––––––––––––

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Germaine Cannady of conspiracy to distribute and possess with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1), and attempted possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(b)(1)(A). After Cannady filed his notice of appeal, the Government uncovered a single piece of paper that might be a tally sheet—a ledger recording drug sales—that it had not previously provided to Cannady. Thereafter, the district court granted Cannady's motion for a new trial, concluding that the Government's failure to disclose the tally sheet violated *Brady v. Maryland*, 373 U.S. 83 (1963). The Government now appeals, and we reverse.

I.

While investigating a nationwide drug distribution network, Federal Bureau of Investigation (FBI) agents arrested Michael Barrett after a search of his RV recovered 25 kilograms of cocaine and 6 kilograms of heroin from hidden compartments. Barrett agreed to cooperate with the FBI and informed the agents that he purchased the drugs from a supplier in California and was preparing to sell them in Baltimore to several customers, including Cannady. During this initial interview, Cannady happened to call Barrett. Barrett answered and told Cannady he was "wrapped up," and Cannady replied, "Oh, all right, Hey, so both right?" (J.A. 133). Barrett would later testify at trial that Cannady's reference to "both" meant that he wanted to purchase both heroin and cocaine from Barrett.

3

Following his arrest, Barrett agreed to aid authorities by participating in a reverse sting where he would meet his customers and supply them with narcotics. Leading up to the sting, Barrett spoke with Cannady and several other associates on the phone. For example, on the day of the sting, Cannady called Barrett to tell him, "You gotta make sure . . . you gotta make sure that ah, that it's both man." (J.A. 136). Barrett responded, "Of course," and "A-1," meaning top quality. (J.A. 136). Cannady responded, "I already know." (J.A. 136). Cannady also discussed pricing with Barrett, explaining "this [stuff] is unbelievable and I ain't gonna let these [people] get over on you. . . . I've been out in the field." (J.A. 137).

Later that day, Cannady and Nic Parker arrived together at the prearranged location to purchase drugs from Barrett. Upon their arrival, both men were arrested. A search of their car turned up four cell phones and a police scanner.

Based on the foregoing, a federal grand jury indicted Cannady, Parker, and seven other defendants for conspiracy to distribute and possess with intent to distribute cocaine and heroin, and attempted possession with intent to distribute cocaine and heroin. Five of the defendants pled guilty; the other four, including Cannady, proceeded to trial.

Barrett was the Government's primary witness at trial and his veracity was a central issue. The defense's theory of the case was that, assuming the defendants were guilty of appearing at the sting, they were not part of Barrett's larger distribution network and had not entered into a conspiracy to distribute cocaine and heroin. Defense counsel cross-examined Barrett for three days, focusing on the leniency he received for testifying, his drug use and abuse, and his deliveries from his California supplier and the distribution

4

of those deliveries. On this latter point, counsel questioned Barrett on whether he had a tally sheet to track his sales. Barrett testified, "I don't keep anything written down," and that, although he forgets things, he keeps all his drug transactions in his head. (J.A. 724). Counsel pressed him on this point, stating "you don't have any evidence other than your word that you ever met with any of these individuals," and that, without a tally sheet, "there would be no evidence of who you gave drugs to, the amount you gave them or anything like, that's all in your mind, correct?" (J.A. 725). Responding to this question, Barrett conceded "I have like wrote something down when I needed to write something down real quick, I destroy it as soon as I do it. But usually I don't even need it." (J.A. 725-26). FBI Agent Eric Nye likewise testified that no tally sheets were recovered but also opined that the existence of tally sheets would have made the case easier by showing the full extent of the distribution network.

The jury convicted the four defendants of both conspiracy and attempted possession, and the district court sentenced Cannady to 192 months imprisonment. After Cannady filed his appeal, the Government notified the district court that, during its preparation for a related trial, it discovered a single sheet of paper that was recovered from a search of Barrett's home. The sheet had a series of notations and numerical calculations but no readily identifiable names (the legible words include "chicken," "missing," and an "@yahoo" email address). (J.A. 95).

Based on this disclosure, all four defendants moved for a new trial, arguing that the Government violated *Brady* by failing to turn over a tally sheet prior to trial. Following a hearing, the district court agreed with the defendants that the Government's

5

failure to turn over the paper violated *Brady* and granted the motion for a new trial. The court made a factual finding that the paper was a tally sheet, and then explained that, because the Government built its conspiracy case on Barrett's testimony and Barrett testified that all the drug sales were in his head, the existence of this sheet was valuable impeachment evidence. The court acknowledged that there was "overwhelming" evidence supporting the attempt convictions, but concluded that a new trial was required on those counts as well because of a "spillover effect." (J.A. 304). [1]

## II.

We review the district court's grant of Cannady's motion for a new trial for abuse of discretion. *United States v. Wilson*, 624 F.3d 640, 660 (4th Cir. 2010). "It is an abuse of discretion for the district court to commit a legal error—such as improperly determining whether there was a *Brady* violation." *United States v. Bartko*, 728 F.3d 327, 338 (4th Cir. 2013) (internal quotation marks omitted). We review the court's legal determination that a *Brady* violation occurred *de novo*, and apply clear error to any factual findings. *United States v. Wolf*, 860 F.3d 175, 189 (4th Cir. 2017).

The *Brady* Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "Therefore, a *Brady* violation contains three elements: the

---

[1] While this appeal was pending, three of the four defendants pled guilty to a single count of attempted possession with intent to distribute. Cannady is the sole remaining defendant.

6

evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." *Nicolas v. Attorney Gen. of Md.*, 820 F.3d 124, 129 (4th Cir. 2016). "Both information that undermines the prosecution's case and information that supports the defendant's case constitute *Brady* material that must be disclosed." *Id.*

The Government argues that there is no *Brady* violation because the tally sheet is not material and that the district court therefore abused its discretion in ordering a new trial. Under *Brady*, materiality "is not a sufficiency of evidence test," and a defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995). Nevertheless, a defendant claiming a *Brady* violation must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *id.* at 435, that is, the evidence must be "likely to have changed the verdict." *Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008) (internal quotation marks omitted).

In *Bartko*, the Government failed to turn over certain proffer agreements that it had entered into with a witness. At trial, the witness testified that he had not received any promises from the Government in exchange for his testimony. In finding that the later-disclosed proffers were not material for purposes of *Brady*, we explained that the impeachment evidence was cumulative: defense counsel's "impeachment of [the witness] was devastatingly thorough and thoroughly devastating," because it encompassed his prior convictions, prior inconsistent statements, his criminal history of fraud, and his inability to remember relevant facts. *Bartko*, 728 F.3d at 338. Given this thorough cross

7

examination, we were left "unable to fathom how the jury's knowing about [the proffers] could have further damaged" the witness' "credibility." *Id.* at 339.

Likewise, the cross-examination here, lasting three days, was thorough, rigorous, and all-encompassing. Barrett was examined repeatedly on his own drug use and abuse, his agreement with the Government, and the lack of supporting documentation for his distribution network. The recovery of a tally sheet may have undermined Barrett's credibility as to only one point—whether he retained records of his drug transactions— but we are "unable to fathom how the jury's knowing about [it] could have further damaged [Barrett's credibility]." *Id.*

In addition to being cumulative, the tally sheet itself is of inconclusive and minimal impeachment value. Barrett testified that he kept all of his sales in his head and that if he wrote anything down he destroyed it. If confronted with the tally sheet during trial, Barrett likely would have amended his answer to say that he always tries to destroy his writings and the cross-examination would have moved along. The existence of a single tally sheet does not significantly impeach or impact Barrett's testimony on the greater point—that he keeps very little records of his drug sales and had nothing but his testimony to support his claims of a drug conspiracy. *Cf. Nicolas*, 820 F.3d at 131 (not unreasonable for state court to determine that undisclosed witness statements were not material when they raised "conflicting inferences" such that the jury "could have found [them] altogether irrelevant"). In fact, defense counsel argued effectively that the absence of tally sheets undermined Barrett's credibility regarding the scope of his drug

distribution network, and Agent Nye himself admitted that a tally sheet would help the Government's case.

In sum, the tally sheet is cumulative impeachment evidence and, even standing alone, is of inconclusive impeachment value. Its nondisclosure does not "put the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, and the district court erred in concluding otherwise.

III.

For the foregoing reasons, we reverse the district court's order granting Cannady a new trial and remand for further proceedings consistent with this disposition.

*REVERSED AND REMANDED*