**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 16-4499**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JESUS ALEJANDRO CHAVEZ, a/k/a Chuy,

Defendant - Appellant.

─────────────

**No. 16-4517**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

OMAR DEJESUS CASTILLO, a/k/a Lil Payaso, a/k/a Lil Slow,

Defendant - Appellant.

─────────────

**No. 16-4523**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSE LOPEZ TORRES, a/k/a Grenas, a/k/a Peluca, a/k/a Medio Polvo, a/k/a Peluquin, a/k/a Jose Alejandro Donez, a/k/a Manuel Lopez Torres,

        Defendant - Appellant.

_____

**No. 16-4819**
_____

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

ALVIN GAITAN BENITEZ, a/k/a Pesadilla, a/k/a Lil Pesadilla, a/k/a Lil Tuner, a/k/a Tooner, a/k/a Lil Tunnel,

        Defendant - Appellant.

_____

**No. 16-4820**
_____

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

CHRISTIAN LEMUS CERNA, a/k/a Leopardo, a/k/a Bago, a/k/a Vago, a/k/a Gatito, a/k/a Christian Josue Lemus Alfaro,

        Defendant - Appellant.

_____

**No. 16-4821**
_____

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

2

v.

MANUEL ERNESTO PAIZ GUEVARA, a/k/a Solitario, a/k/a Colita,

　　　　Defendant - Appellant.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:14-cr-00306-GBL-2; 1:14-cr-00306-GBL-4; 1:14-cr-00306-GBL-5; 1:14-cr-00306-GBL-6; 1:14-cr-00306-GBL-8; 1:14-cr-00306-GBL-10)

_____

Argued: May 10, 2018　　　　　　　　　　　　　　　　　　Decided: July 2, 2018

_____

Before WILKINSON, MOTZ, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge King joined.

_____

**ARGUED:** Jerome Patrick Aquino, Springfield, Virginia; Christopher Bryan Amolsch, Alexandria, Virginia, for Appellants. Tobias Douglas Tobler, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Elita C. Amato, LAW OFFICE OF ELITA C. AMATO, Arlington, Virginia, for Appellant Jesus Chavez. Amy L. Austin, LAW OFFICE OF AMY L. AUSTIN, PLLC, Richmond, Virginia, for Appellant Alvin Benitez. Frank Salvato, Alexandria, Virginia, for Appellant Christian Cerna. Jeffrey D. Zimmerman, JEFFREY ZIMMERMAN, PLLC, Alexandria, Virginia, for Appellant Alvin Benitez. Robert L. Jenkins, Jr., BYNUM & JENKINS, PLLC, Alexandria, Virginia, for Appellant Jose Torres. Katherine Martell, FIRST POINT LAW GROUP, PC, Fairfax, Virginia; Meredith M. Ralls, S&R LAW FIRM PLLC, Fairfax, Virginia, for Appellant Omar Castillo. William M. Chick, Jr., LAW OFFICES OF W. MICHAEL CHICK, JR., Fairfax, Virginia, for Appellant Manuel Guevara. Dana J. Boente, United States Attorney, Julia K. Martinez, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

WILKINSON, Circuit Judge:

After a seven-week jury trial, the six defendants in this case were each convicted of all the crimes with which they were charged, including violent crimes in aid of racketeering. All six appeal their convictions, raising a wide variety of alleged deficiencies in the trial, including *Brady* violations, failure to give certain jury instructions, mistaken evidentiary rulings, and basic complaints about having a joint trial, among others. As discussed below, we reject each of these challenges, and affirm the convictions.

## I.

Jesus Alejandro Chavez, Alvin Benitez, Omar Castillo, Jose Torres, Christian Cerna, and Manuel Guevara are members of the MS-13 gang. This case arises out of a series of violent crimes committed by the gang during 2013 and 2014.

In October 2013, defendant Torres and other MS-13 gang members attempted to murder "Peligroso," a fellow gang member who had broken MS-13's rules. Several days later, gang members including defendants Torres and Castillo murdered Nelson Omar Quintanilla Trujillo, an MS-13 member who was suspected of being a government informant. Trujillo was then buried in a shallow hole in a park, with gang members later returning to move and rebury his body. In March 2014, defendants Castillo, Cerna, Benitez, and Guevara murdered Gerson Adoni Martinez Aguilar for breaking MS-13 rules. Finally, on June 19, 2014, defendant Chavez murdered Julio Urrutia for disrespecting MS-13.

4

In June 2015, a grand jury indicted the six appellants and seven other members of MS-13 for their involvement in these crimes. Among other charges, each defendant was indicted for either murder in aid of racketeering or conspiracy to commit murder in aid of racketeering. The racketeering enterprise, as alleged in the indictment, is the MS-13 organization. Six of the indicted individuals pleaded guilty, while the other seven proceeded to trial.[*] Five of those who pleaded guilty cooperated with the government during the prosecution and at trial.

Following a seven-week trial, a jury found each defendant guilty of each charge against him. After sentencing, the defendants filed this appeal, alleging that the government violated its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). Certain defendants also challenge their convictions based on alleged deficiencies in the jury instructions, erroneous evidentiary rulings, failure to grant severance motions, violations of statutory rights to counsel, and insufficient evidence. Two defendants also challenge their sentences on constitutional grounds. We address each of these challenges in turn.

## II.

The defendants first allege that the government violated its *Brady* and *Napue* duties. Under *Brady*, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or

---

[*] A mistrial was declared as to one defendant, who is therefore not part of this appeal.

5

to punishment." 373 U.S. at 87. Relatedly, under *Napue*, the government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" or "allow[] it to go uncorrected when it appears." 360 U.S. at 269. The defendants assert that the government breached each of these duties in its treatment of the testimony of Junior, an MS-13 member turned government cooperator.

A.

Before addressing the defendants' arguments, additional background on Junior's testimony and immigration proceedings is necessary. During the government's investigation of MS-13, Junior infiltrated the defendants' "clique" within MS-13, surreptitiously recorded telephone calls with the defendants, and was eventually led by one of the defendants to the bodies of two murder victims. At trial, Junior testified for the government, explaining the contents of the recorded phone calls and helping to establish the validity of the forensic evidence obtained from the victims' bodies. Through his cooperation, Junior gained significant immigration benefits, including deferred action to allow him to stay in the United States to continue his work with the FBI. Junior also applied for and received a green card prior to trial in this case. While the green card was largely obtained through regular immigration proceedings rather than through prosecutorial intervention, the FBI did write a letter to immigration authorities on his behalf.

These immigration benefits were extensively discussed at trial. At one point, the prosecution asked Junior, "Did the FBI have any involvement in your attempt to get the green card?" J.A. 3682. Junior responded that the FBI wrote a letter, but that "the letter

6

was returned" and the immigration judge "didn't get the letter." J.A. 3683. During cross-examination, Junior acknowledged that in fact he did "show a letter to the judge when [he] was in front of the judge" and the FBI's letter was thus ultimately delivered by Junior personally. J.A. 4137–38.

Following direct examination of Junior but before the cross-examination, defense counsel requested a subpoena duces tecum to obtain Junior's immigration documents. Because counsel acknowledged that his request was based solely on "a feeling . . . that there's something in [the immigration documents] that goes to truthfulness," J.A. 3830, the district court denied the request. After the trial, the defendants moved for a new trial based on the government's alleged failure to disclose exculpatory or impeachment materials related to Junior, including Junior's immigration records. The district court denied the motion.

In a separate proceeding regarding another MS-13 defendant, Douglas Duran Cerritos, the government was ordered to obtain, review, and provide to the court for in camera review Junior's immigration files. Pursuant to those orders, the government produced for Cerritos three immigration forms on which Junior had failed to fully disclose his prior criminal convictions and his connections to MS-13. All of Junior's convictions and his MS-13 connections appeared elsewhere in his immigration file.

After the Cerritos disclosures, the district court in this case ordered the government to produce the documents that had been unveiled in the Cerritos case. The defendants requested a new trial as well as a hearing to establish a factual basis for their *Brady* and *Napue* claims based on these materials. The district court denied these

7

motions, finding that the government did not know or have reason to know of the impeachment potential of the immigration documents, and that the new disclosures were immaterial in any event.

B.

To succeed on a *Brady* claim, the defendants must establish that "the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." *Nicolas v. Attorney General of Maryland*, 820 F.3d 124, 129 (4th Cir. 2016) (citing *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003)). Where, as here, a *Brady* claim falters so clearly on materiality, we may proceed directly to address that element.

Evidence is material under *Brady* if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Whatever impeachment value Junior's immigration files may have held, it certainly did not rise to that level.

The defendants emphasize the importance of Junior's testimony, noting that the prosecution hailed him as a "hero" during closing argument. J.A. 6440. But much of Junior's value stemmed from his investigative work prior to trial and the evidence he helped the government to obtain, rather than from his bare testimony. At trial, the government had at least two eyewitnesses testify for each murder. The government also provided hours of recorded phone calls in which the defendants implicated themselves and each other in the charged crimes. Physical and forensic evidence further implicated the defendants. Impeaching Junior's testimony would have done almost nothing to

8

undermine what the district court described as a "substantial, overwhelming, [and] significantly corroborated" body of evidence. J.A. 7273.

Additionally, the defense had the opportunity to impeach Junior's testimony repeatedly throughout the trial. The immigration benefits that Junior received through his cooperation with the government were extensively discussed, allowing the defense to impugn Junior's motives for testifying. Junior's initial claim that the immigration judge never received the letter, paired with his admission on cross-examination that he had hand-delivered the letter to the judge, may also have impaired Junior's trustworthiness in the eyes of the jury. It cannot be that Junior's omission of criminal convictions and gang membership information on some, but not all, of his immigration forms tips the balance of the evidence sufficiently to throw the jury's entire verdict into question. The purportedly suppressed evidence, then, was not material under *Brady*.

## C.

The defendants' *Napue* claim falters on similar grounds. Under *Napue*, "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citations omitted). Thus, the government may not knowingly offer false testimony in the first place, and must correct it when it appears. *United States v. Kelly*, 35 F.3d 929, 933–34 (4th Cir. 1994).

Junior's initial testimony that the FBI's letter on his behalf in his green card proceedings was returned, and thus not received by the immigration judge, was at best

9

incomplete and misleading. But this testimony was corrected when Junior admitted on cross-examination that he personally delivered the letter to the immigration judge. Under these circumstances, "[h]ad there been any possibility of confusion, it was eliminated when [the witness] corrected [him]self." *Daniels v. Lee*, 316 F.3d 477, 494–95 (4th Cir. 2003). It is difficult to imagine how a conviction could have been "obtained by the knowing use of perjured testimony" when that testimony was almost immediately corrected by the witness himself. It is unclear what more the government could or should have done to correct the false testimony once Junior had corrected himself on the stand.

Further, the government has repeatedly asserted, both below and on appeal, that it had no knowledge of Junior's hand-delivery of the FBI letter until he mentioned it on cross-examination. The defendants offer no evidence to the contrary. Because a *Napue* violation can be found only for *knowingly* offering or failing to correct false testimony, this is a fatal flaw in their claim. If the government learned of the false testimony simultaneously with the defense and the jury learning the truth, the government could not have done anything differently to preemptively correct the false testimony.

Finally, as with the *Brady* claim, the defendants' *Napue* claim would falter on materiality even if the other elements were met. Junior's misleading testimony related only to whether his green card was obtained with or without the FBI's help. Even before correcting himself on cross-examination, Junior had admitted that investigators helped him obtain deferred action and attempted to help him get a green card. The further detail that the FBI's letter actually made it to the immigration judge is thus of at best minor additional impeachment value. The jury was already well aware that Junior had obtained

10

significant immigration benefits through his cooperation with the government. Whether the FBI's letter was successfully delivered to the immigration judge or not could not plausibly throw the jury verdict into question, particularly when the truth of the matter was disclosed to the jury during the trial.

III.

In addition to their specific *Brady* and *Napue* claims, the defendants also assert broadly that the government engaged in a pattern of prosecutorial misconduct. To succeed on a prosecutorial misconduct claim, the defendants must show that the government's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The conduct the defendants complain of falls well short of this standard. Instead, the defendants point to a small number of isolated incidents that did not go to the basic fairness of the trial. For example, the defendants complain that the prosecution improperly used oral objections "to telegraph how its witnesses were to answer questions posed by defense counsel." Defendants' Br. 79. The district court agreed that some of the prosecution's objections were improper, but it cured any prejudice through a specific admonishment to the jury that "the testimony of the witnesses . . . is something for you to decide because you're the judges of the facts" and that speaking objections should therefore be disregarded. J.A. 5320–21.

The defendants also quibble with the prosecution's closing arguments, complaining that one witness's testimony was mischaracterized and that the prosecution's

11

closing misstated the law by encouraging the jury to accord greater weight to two government witnesses' credibility due to those witnesses' guilty pleas. The question of how to characterize the evidence is one the defense and government will frequently disagree over, and it is well within the power of the jury to resolve such disputes. And the prosecution's minor misstatement of the law during closing, if there was one, was largely cured by the court's proper instructions to the jury on that issue. In any event, two isolated misstatements during closing, following a seven-week trial, would need to be much more significant to rise to the level of prosecutorial misconduct.

Under *Darden*, prosecutors are not required to be perfect, and indeed they could hardly be expected to be. Prosecutors should of course strive for impeccable performance and seek to avoid all improper behavior, but isolated and immaterial incidents such as those at issue here do not implicate the overall fairness of the trial, and therefore do not necessitate a new one.

IV.

Turning to the individual appeals, appellant Cerna claims that he is entitled to a new trial based on the district court's failure to provide his requested jury instructions. Cerna was convicted of murder in aid of racketeering for Aguilar's death. This appeal contends that the district court erred in declining to give instructions on the lesser-included crimes of assault and attempt, and that the district court insufficiently instructed the jury on the "purpose" element of racketeering crimes.

We review a district court's "decision to give (or not to give) a jury instruction . . . for abuse of discretion." *United States v. Hager*, 721 F.3d 167, 184 (4th Cir. 2013)

12

(quoting *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992)). When the district court declines to give an instruction requested by a defendant, that decision is an abuse of discretion only if the requested instruction "(1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense." *Id.* (citing *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995)). Even if these criteria are satisfied, we will reverse only if "the record as a whole demonstrates prejudice." *Id.* (citing *United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997)).

## A.

Lesser-included crime instructions are appropriate when "the proof of the element that differentiates the two offenses [is] sufficiently in dispute that the jury could rationally find the defendant guilty of the lesser offense but not guilty of the greater offense." *United States v. Wright*, 131 F.3d 1111, 1112 (4th Cir. 1997).

Here, there was no evidence to support giving instructions on either assault or attempt with respect to Aguilar's murder. Cerna claims an attempt instruction would have been appropriate because a jury could have concluded that he "was part of an attempt to kill or injure [Aguilar], while others actually committed the act without his participation." Defendants' Br. 39. Cerna also points out that there was conflicting evidence at trial "on which defendants were present at Aguilar's murder; of those present, which actually participated in Aguilar's murder; [and] which defendants, if any, had prior knowledge that Aguilar was to be murdered." Defendants' Br. 38.

13

But none of these disputes would support finding Cerna guilty of attempt or assault, rather than murder. No defendant disputed at trial that a murder in fact took place. And because Cerna was charged both as a principal and as an aider and abettor, he need not have physically committed the murder in order to be found guilty. Cerna was either guilty of this murder, whether as a principal or an aider/abettor, or he was not. No reasonable jury could have found him guilty of assault or attempt but not murder. Thus, the district court did not abuse its discretion by refusing to give instructions as to those lesser included offenses.

B.

We are similarly unable to find fault with the district court's purpose instruction. Murder in aid of racketeering has an element requiring that the defendant's "general purpose in [committing the murder] was to maintain or increase his position in the enterprise." *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)). The district court instructed the jury that the government had to "prove beyond a reasonable doubt that at least one of the defendant's purposes in committing the violent crimes . . . was to gain entrance into, maintain or increase his position in a racketeering enterprise." J.A. 6316. Further, the district court told the jury that it "need not find that maintaining or increasing position in the enterprise was the defendant's sole or even principal move." J.A. 6316.

The defendants, by contrast, requested that the jury be instructed that maintaining or increasing his position in the enterprise must be "one of the defendant's *dominant* purposes in committing the crime." Defendants' Br. 43 (emphasis added). Under this

14

circuit's precedent, the district court properly rejected this proposed instruction. Neither the statute nor *Fiel* require that enterprise membership be a dominant purpose for the defendant. In fact, we have upheld convictions under this statute when "the evidence clearly established private revenge as [a defendant's] primary purpose," because "the deeds were done . . . in part at least in furtherance of the enterprise's . . . reputation for violence." *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996). The jury instructions actually given by the district court provided an accurate statement of the law, and we find no abuse of discretion in the court's refusal to instruct the jury on a more stringent standard.

V.

Next, Cerna asserts that the district court abused its discretion by admitting evidence of his involvement in Trujillo's murder, with which he was not charged, and that he is therefore entitled to a new trial. We disagree.

Prior to trial, the government notified Cerna that it planned to introduce evidence of his involvement in the Trujillo murder under Federal Rule of Evidence 404(b). That rule prohibits introduction of evidence of a crime "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FRE 404(b)(1). However, it allows such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FRE 404(b)(2). The government argued that Cerna's involvement in Trujillo's murder was relevant to demonstrate his membership in MS-13 and his state of mind regarding Aguilar's murder. The district court rejected these arguments and

15

prohibited the government from presenting any evidence of Cerna's involvement in Trujillo's murder.

Later, the government sought to introduce redacted transcripts of recordings that, in their unredacted form, implicated Cerna in Trujillo's murder. The government also sought to introduce evidence of Cerna's involvement in the reburial of Trujillo's body after his murder. Over Cerna's objections, the district court granted these motions in full. The court held that introducing evidence of Trujillo's reburial would not implicate Cerna in Trujillo's murder, and thus that it was consistent with the court's earlier 404(b) ruling.

On appeal, Cerna asserts that the district court abused its discretion by permitting evidence that implicated Cerna in Trujillo's murder, contending that this evidence was barred by FRE 403, FRE 404, and the district court's own 404(b) ruling. The government maintains that evidence of Cerna's participation in Trujillo's murder could properly have been admitted below, but that no such evidence was admitted at trial in any event.

We need not reach the question whether the district court's initial 404(b) ruling was required by our precedents. The evidence presented at trial did not actually identify Cerna as Trujillo's murderer; it simply established that he was involved in Trujillo's reburial. Contrary to Cerna's claims, the jury would not naturally infer that Cerna was Trujillo's murderer from the fact of Cerna's involvement in Trujillo's reburial. The trial included extensive evidence regarding other defendants' involvement in Trujillo's murder, and no evidence at all that Cerna was involved in the murder. Thus, the question of whether evidence of Cerna's involvement in the murder would have been admissible at trial is not properly before us.

16

On the question that is properly before us, we hold that Cerna is not entitled to a mistrial or a new trial. Assuming *arguendo* that any of the evidence at issue here was erroneously admitted, we must still assess evidentiary rulings for harmless error. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010). Any potential prejudice against Cerna was minimal. The prejudicial effect of evidence of uncharged crimes is minimized when the charged crimes are of a similar or more severe nature. Here, evidence of Trujillo's reburial would have minimal prejudicial effect when the trial necessarily included detailed evidence of Aguilar's murder as well as evidence regarding Trujillo's murder by other defendants. Whatever prejudice existed was also minimized by jury instructions to the effect that Cerna was not charged with any crime related to Trujillo and that the reburial evidence could be used for only limited purposes. Specifically, the district court told the jury that the reburial evidence could not be used "as a substitute for proof that the defendant committed the crime charged" or "as proof that the defendant has a bad character or any propensity to commit such crimes." J.A. 6331. In light of such clear limiting instructions from the district court, and the weight of the evidence against him, Cerna cannot show that evidence of Trujillo's reburial caused unfair prejudice.

VI.

In related challenges, two groups of defendants argue that the district court abused its discretion by denying their severance motions. To succeed, the defendants must overcome the "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). This preference is rooted in the fact that joint trials "promote efficiency and 'serve the interests of justice by

17

avoiding the scandal and inequity of inconsistent verdicts.'" *Id*. (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). These interests are so substantial that "courts have reversed relatively few convictions for failure to grant a severance" and the Supreme Court "repeatedly ha[s] approved of joint trials." *Id*. at 537–38 (citing *Richardson*, 481 U.S. at 210; *Opper v. United States*, 348 U.S. 84, 95 (1954); *United States v. Marchant*, 12 Wheat. 480 (1827)).

The cases recognize the extent to which it would strain judicial and community resources to provide each defendant a separate trial in every case. As this case amply illustrates, full trials are intensely demanding on witnesses, jurors, victims and their families, and other participants in the judicial system. Particularly in cases like this one, where a primary focus of the trial was the interwoven relationships among defendants, separate trials would be repetitive, requiring witnesses to provide the same testimony many times. The trial in this case was already seven weeks long; separate trials for each of the six defendants would inevitably have stretched out over the course of months or even years.

Appellant Chavez argues, however, that severance was necessary because the trial included evidence of violent racketeering activity that he was not directly involved in. We have previously rejected an almost identical argument for severance when each defendant was required to defend "against a body of evidence that included separate murders not attributable to all defendants." *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012). As in *Dinkins*, each defendant here was charged with involvement in at least one murder, so any prejudice stemming from dramatically different degrees of

18

culpability was especially unlikely. *See id.* (citing *Zafiro*, 506 U.S. at 539). And again, as in *Dinkins*, the district court gave appropriate limiting instructions to the jury that further lessened any risk of unfair prejudice. *See id.* Chavez has failed to distinguish his case from *Dinkins*, and has not demonstrated a sufficient risk of prejudice to merit severance.

Defendants Benitez, Castillo, and Cerna request severance on the distinct ground that defendant Guevara presented an antagonistic defense. But the Supreme Court has clearly held that "[m]utually antagonistic defenses are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538. Instead, antagonistic defenses necessitate severance only if there is "such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010) (quoting *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002)) (alterations omitted). Guevara's defense does not rise to this level. Guevara argued at trial that he was not guilty in part because he, unlike others involved in Aguilar's murder, lacked foreknowledge of the murder plot. This defense is not inconsistent with the defenses of Benitez, Castillo, or Cerna, all of whom emphasized that the government could not prove who was present at Aguilar's murder, who participated in the murder, who knew of the murder plot in advance, or the motives of those who murdered Aguilar. The core of Guevara's defense was perfectly consistent with the core of the defense presented by Benitez, Castillo, and Cerna—everyone was essentially disclaiming personal responsibility for Aguilar's death. These defendants are thus also unable to establish that they were entitled to separate trials.

19

## VII.

The next challenge comes from defendant Guevara, who argues that the district court denied him his statutory right to two lawyers under 18 U.S.C. § 3005. Under that statute, if a defendant is "indicted for treason or other capital crime," "upon the defendant's request" for defense counsel, the court must "assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases." 18 U.S.C. § 3005. We have interpreted this statute to apply even when the government does not actually seek the death penalty, if the defendant is indicted for a capital crime. *United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001). Because murder in aid of racketeering is a capital crime, 18 U.S.C. § 3005 is applicable to the defendants here.

In this case, the district court sua sponte appointed two attorneys for Guevara: David Baugh as learned counsel and William Michael Chick, Jr., as second chair counsel. Two months before trial was scheduled to begin, however, Baugh notified the government that he would be unable to proceed with the trial as scheduled due to a medical issue. Baugh thus requested a continuance. The district court instead asked Chick to seek a replacement attorney for Guevara. After consulting with the Federal Public Defender and other qualified attorneys, Chick was unable to find a suitable replacement attorney who was willing to take the case without a continuance. Chick then moved for a severance and continuance. The district court denied this motion, instead removing Baugh from the case and indicating its willingness to appoint a substitute attorney should one be identified.

Section 3005 does not directly address what is required of a district court under these circumstances. And as a practical matter, it would be impossible for a statute to adequately address every possible change in representation that might occur before or during a trial. The district court must thus be afforded some measure of discretion to determine what justice requires in a particular case. In related contexts, the Supreme Court has acknowledged that "broad discretion must be granted trial courts on matters of continuances" that are requested to permit a defendant to go to trial with his preferred counsel. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983). Thus, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). In this way, the issue of withdrawn counsel is like other questions of trial management, over which "[d]istrict courts enjoy broad latitude" because such issues "'are quintessentially their province.'" *United States v. Beckton*, 740 F.3d 303, 306 (4th Cir. 2014) (quoting *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006)) (alteration omitted).

The district court reasonably exercised its discretion here. The district court continued throughout the process to emphasize its willingness to appoint replacement counsel. Yet after a brief search for replacement counsel, Chick apparently ceased his efforts to find an additional attorney for Guevara, and he never requested that the district court itself identify and appoint new counsel. In other words, neither Guevara nor Chick actually invoked § 3005 as neither "request[ed]" that the district court assign a substitute attorney to replace Baugh. 18 U.S.C. § 3005. This is all despite the fact that two attorneys

21

for other defendants were forced to withdraw from the case around the same time as Baugh, and replacement attorneys were found and appointed for each of those defendants.

Granting a severance and continuance to Guevara would have placed government witnesses in potential danger and strained the government's resources. The district court balanced these potential harms against Guevara's interests. Finding that Guevara had already received the substantial benefit of a second attorney through the pre-trial period, the district court determined that Guevara would have a fair trial even if Baugh were removed from the case and Chick were his only counsel at trial.

Ultimately, Guevara's complaint boils down to frustration that the withdrawal of one of his lawyers was not handled precisely as he would have wished. But defendants are not invariably entitled to go to trial with their preferred counsel, and 18 U.S.C. § 3005 does nothing to strip the district court of its ordinary powers of trial management. The district court did not abuse its discretion by removing Baugh from the case and proceeding to trial as scheduled.

## VIII.

Following trial, defendant Chavez moved for a new trial on the grounds that there was insufficient evidence to support his conviction. Such motions are disfavored, and are to be granted "only when the evidence weighs heavily against the verdict." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997)). The district court denied Chavez's motion, explaining that not

only was there sufficient evidence to convict him, but that "this was not a close case." J.A. 6972. We review this decision for abuse of discretion. *Wilson*, 118 F.3d at 237.

No such abuse occurred here. At trial, three eyewitnesses identified Chavez as Urrutia's murderer. The trial evidence also included a recorded phone call in which Chavez effectively admitted that he killed Urrutia. Chavez notes some inconsistencies in the testimony of government witnesses and also points to the testimony of one witness who, while not a witness to the murder itself, saw an altercation between Urrutia and a shirtless man shortly before the murder. We may assume, then, that Chavez's defense was not entirely lacking in evidentiary support.

Ultimately, though, determining witness credibility and weighing conflicting evidence are the responsibility of the factfinder. We do not lightly disturb jury verdicts, and even "disagreement with the jury's verdict [would] not mandate a new trial." *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985). We decline to overturn a jury verdict in a case where, as the district court noted, the government provided ample evidence of the defendant's guilt.

IX.

Chavez also contends that his cell phone records were unconstitutionally obtained without a warrant and that the resulting evidence should have been suppressed at trial as a result. Specifically, the government obtained from T-Mobile cell site tracking data associated with Chavez's cell phone through a court order issued under the Stored Communications Act, 18 U.S.C. §§ 2703(c)(1)(B), 2703(d), and related provisions of Virginia state law, Va. Code §§ 19.2-70.3(A)(3), -70.3(B). Chavez contends that these

23

procedures were unconstitutional, and that the government should have been required to obtain a warrant for the records.

In *United States v. Graham*, we held that "the government does not violate the Fourth Amendment when it obtains historical [cell site location information] from a service provider without a warrant." 824 F.3d 421, 425 (4th Cir. 2016) (en banc). In *Carpenter v. United States*, however, the Supreme Court made clear that the government's acquisition of Carpenter's cell site records "was a search within the meaning of the Fourth Amendment." No. 16-402, slip op. at 17, 585 U.S. — (June 22, 2018). While *Carpenter* is obviously controlling going forward, it can have no effect on Chavez's case. The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). Thus, when investigators "act with an objectively 'reasonable good-faith belief' that their conduct is lawful," the exclusionary rule will not apply. *Id.* at 238 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Objectively reasonable good faith includes "searches conducted in reasonable reliance on subsequently invalidated statutes." *Id.* at 239. Chavez does not, and cannot, deny that investigators in this case reasonably relied on court orders and the Stored Communications Act in obtaining the cell site records. Without question, then, the good-faith exception to the exclusionary rule applies to investigators' actions here.

Moreover, it is plain beyond a reasonable doubt that any error related to this evidence was harmless. As discussed above, three eyewitnesses testified at trial that Chavez murdered Urrutia. Chavez also discussed the murder in a recorded conversation

24

introduced at trial. The district court concluded that "this was not a close case." J.A. 6972. Any marginal benefit Chavez might have derived from suppression of the cell phone location data would not have altered the outcome of the trial.

X.

Finally, two defendants, Guevara and Cerna, challenge their sentences as violations of the Eighth Amendment, based on their youth at the time of the crimes of conviction and their purportedly minor roles in those crimes.

Both defendants were convicted of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), which provides for punishment "by death or life imprisonment," and does not permit a district court to impose a shorter sentence regardless of mitigating circumstances. At the time of the crimes of conviction, Cerna was 18 years old and Guevara was 19.

The Supreme Court has held that mandatory life sentences are unconstitutional as to defendants who committed their crimes as juveniles. *See Miller v. Alabama*, 567 U.S. 460, 470 (2012). But this is no help to the defendants, both of whom were adults at the time they committed murder in aid of racketeering. Contemporary "society draws the line for many purposes between childhood and adulthood" at 18 years old. *Roper v. Simmons*, 543 U.S. 551, 574 (2005). Guevara and Cerna both emphasize that they were barely over this threshold of adulthood at the time they committed their crimes. It is true, of course, that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id*. At the same time, "some under 18 have already attained a level of maturity some adults will never reach." *Id*. Individual differences in maturity will

25

necessarily mean that age-based rules will have an element of arbitrariness, particularly when they have such stark differences in effect between those just one week below the cut-off and those just one week above. Nonetheless, rules based on age are historically common and appear in many areas of the law. Consider the legal age requirements for driving, drinking alcohol, registering for the draft, voting, holding certain public offices, and marrying, among other things. The lines drawn by age in all of these examples will be imperfect fits for some individuals. But we cannot say that this makes them unconstitutional.

The Supreme Court has also held that a capital sentence cannot be imposed without individualized consideration by the jury of any mitigating factors. *See Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006). But these defendants were not given death sentences. They were sentenced to life imprisonment, which the Supreme Court has held does not require such individualized consideration. *See Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991). In light of this precedent, the district court correctly applied the mandatory life sentence as written by Congress.

XI.

Based on the foregoing, the judgments of the district court are

*AFFIRMED*.