IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,               )
                                   )    No. 37141-7-III
                Respondent,        )    (Consolidated with
                                   )    No. 36744-4-III)
        v.                         )
                                   )
MICHAEL RANDALL LAUDERDALE,        )    UNPUBLISHED OPINION
                                   )
                Appellant.         )
                                   )
                                   )
In the Matter of the Personal Restraint of  )
                                   )
MICHAEL RANDALL LAUDERDALE,        )
                                   )
                Petitioner.        )

SIDDOWAY, J. — Michael Lauderdale appeals the sentence of life without the

possibility of parole imposed at his 2019 resentencing for an aggravated first degree

murder he committed in 1994, when he was 19 years old. He contends the trial court

abused its discretion by failing to recognize its discretion to impose a mitigated

exceptional sentence, and his lawyer provided ineffective assistance of counsel by failing

to advocate for such a sentence.

In a personal restraint petition (PRP) that we consolidated with the appeal, Mr.

Lauderdale argues that insufficient evidence supported the aggravating factor relied on by

the State in charging aggravated first degree murder: that the murder was committed in the course of, in furtherance of, or in immediate flight from the crime of rape in the first or second degree.

The trial court and defense counsel correctly concluded that life without the possibility of parole was the only sentence the court could impose. Mr. Lauderdale's PRP fails to present competent evidence that the State's evidence of aggravated first degree murder at his 1995 trial was insufficient.

We affirm Mr. Lauderdale's sentence and dismiss his PRP.

FACTS AND PROCEDURAL BACKGROUND

We draw basic facts about Michael Lauderdale's crime from this court's unpublished opinion in his original appeal.

On September 17, 1994, a jogger discovered the naked body of Jeremy Wood on Canyon Road Number Two in Wenatchee. *State v. Lauderdale*, 1996 WL 538806, at \*1 (Wash. Ct. App. Sept. 24, 1996). There was a couch in the vicinity. The sheriff's investigation collected evidence that included a tire track, drag marks, a condom wrapper, the victim's jeans turned inside out, ligatures on the victim's legs, and blood on the couch.

A sergeant with the Chelan County Sheriff's Office learned from Mr. Wood's family that he had gone to a party the night before. Persons present at the party reported that Mr. Wood left the party with Mr. Lauderdale, who was driving a car borrowed from

2

Brooc Adams. Mr. Lauderdale lived in a trailer in the backyard of Ms. Adams's family's home.

Mr. Lauderdale agreed to speak with a detective, and initially told him that he had driven Mr. Wood to the top of Fifth Street and dropped him off.

In a continued interview with another officer, however, Mr. Lauderdale stated that he and Mr. Wood had driven to Canyon Road Number Two, where they kissed and eventually had consensual anal sex on a couch they saw through a barbed wire fence. Mr. Lauderdale said that Mr. Wood's death was an accident: that after Mr. Lauderdale got in the car, Mr. Wood stopped to urinate, and when Mr. Lauderdale revved the engine as a joke, he accidentally ran over Mr. Wood. When he discovered Mr. Wood was dead, he pulled the body back to the couch to cover up the accident.

Investigators with the sheriff's department found Mr. Lauderdale's story inconsistent with the evidence and concluded a beating had occurred. Blood on a baseball bat later found 50 feet from where Mr. Wood's body was found proved to match a blood sample taken from Mr. Wood.

Dr. Gerald Rappe performed an autopsy on Mr. Wood from which he concluded that the cause of death was five blows to the head, which was the only significant injury. There were no marks on Mr. Wood's legs indicating any struggle against the ligatures. There was a bruise on his hand consistent with a defense wound. Dr. Rappe found feces

3

on Mr. Wood's buttocks and inner thighs. Since Dr. Rappe found no trauma to Mr. Wood's anus or rectum, he believed sex occurred after the victim was dead.

Ms. Adams's stepfather, who owned the trailer in which Mr. Lauderdale lived, eventually identified the bloodied bat as his Louisville Slugger, pointing to his carved-in initials, J.S. Shortly before trial the defense received an additional police report revealing that Ms. Adams had used the bat the day Mr. Woods was killed, it was not in the car when she loaned it to Mr. Lauderdale, and it was not on the back porch when she looked for it a few days later. Mr. Lauderdale recognized that this evidence suggesting that he took the bat with him when he returned to the party was relevant to the issue of premeditation. Claiming surprise, he sought a continuance of trial, which was denied.

A jury found Mr. Lauderdale guilty of both first degree murder with aggravating factors and first degree felony murder. He was sentenced to life without the possibility of parole. His appeal, in which he claimed only ineffective assistance of counsel, was unsuccessful.

Over 20 years later, in January 2019, Mr. Lauderdale filed a CrR 7.8 motion in which he raised two issues. The first was that his conviction for felony murder should be vacated on double jeopardy grounds. The second was that insufficient evidence was presented in support of the alleged aggravator that he committed the murder in the course of, in furtherance of, or in immediate flight from a first or second degree rape. He

pointed to the statement in this court's opinion on appeal that Dr. Rappe believed sex occurred after Mr. Wood was dead. While a crime, that would not be rape.

The trial court, the Honorable Lesley Allan, transferred the portion of Mr. Lauderdale's motion challenging evidence sufficiency to this court for consideration as a PRP. In moving for such a transfer, the State pointed out that despite an extensive search for the trial transcript, it could not be found; that Mr. Lauderdale had not made a substantial showing that he was entitled to relief or that resolution of the CrR 7.8 motion required a factual hearing; and that under the circumstances CrR 7.8(c)(2) required transfer. Judge Allan agreed that the State had made "what appears to be a diligent search for the transcript," "it appears that, based on the passage of time, it has been disposed of," and, "[i]t does not appear that there is any mechanism available now to accurately recreate it." Clerk's Papers (CP) at 83.

Having concluded that Mr. Lauderdale was entitled to have the felony murder conviction removed from his judgment and sentence, Judge Allan directed the State to prepare an amended judgment and sentence. In a letter to the parties, she stated that Mr. Lauderdale could sign and return the State's proposed amended judgment and sentence or, "In the alternative, the court will approve an order to transport Mr. Lauderdale to the Chelan County Regional Justice Center to appear for another sentencing hearing." CP at 84.

5

Mr. Lauderdale moved for appointment of counsel to represent him at resentencing. Judge Allan granted the motion.

The State then moved to limit the resentencing. Specifically, it asked that Mr. Lauderdale appear telephonically, that he be precluded from arguing for a change to the length of his sentence, and that he be denied allocution. The State's motion was heard by the Honorable Kristine Ferrera. Mr. Lauderdale's counsel opposed the motion in part, stating, "[E]ven if there is nothing the Court can do regarding a punishment as far as how much time he can get or anything, he's still allowed allocution." Report of Proceedings (RP) (May 30, 2019) at 23. Judge Ferrera ordered a resentencing that would include Mr. Lauderdale's right to allocute, but ruled that he was prohibited from arguing for a different sentence.

At a resentencing hearing conducted by Judge Ferrera two weeks later, defense counsel agreed that life without parole was the only possible sentence. Mr. Lauderdale apologized to the court and to those present for his crime and for reopening old wounds, discussed the rough start he had in life, and talked about the progress he had made in prison. Judge Ferrera apologized to the victim's friends and family for subjecting them to a second resentencing. She acknowledged that Mr. Lauderdale was doing the best he could in prison and encouraged him to stay on that path. An amended judgment and sentence was entered that identified only the aggravated first degree murder conviction and imposed a sentence of life without the possibility of parole.

6

Mr. Lauderdale appealed. This court consolidated Mr. Lauderdale's PRP with the appeal.

## ANALYSIS

### DIRECT APPEAL

Relying on a number of United States Supreme Court and Washington decisions that consider current brain science in applying constitutional and statutory provisions to criminal sentencing, Mr. Lauderdale asks us to hold that the trial court enjoyed discretion to impose a lesser sentence than life without the possibility of parole. His alternative argument, that he received ineffective assistance of counsel because his lawyer did not advocate for such a sentence, depends on the same premise.

It can be argued from current brain science that Mr. Lauderdale's offense conduct might be partially explained by brain immaturity similar to the juvenile offenders in the cases on which he relies. The problem with his argument is that those cases involve either protection provided by the Eighth Amendment to the United States Constitution to defendants younger than age 18 at the time they committed their crime, or to sentencing under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, which includes provisions for mitigated sentencing. Neither applies to Mr. Lauderdale.

*Brain science and the Eighth Amendment*

The Eighth Amendment to the federal constitution prohibits the infliction of "cruel and unusual punishment." For the most part, the United States Supreme Court's

7

precedents applying the Eighth Amendment "consider punishments challenged not as inherently barbaric but as disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Disproportionate punishment was at issue in three cases decided by the United States Supreme Court in the last 15 years in which, after taking into consideration current brain science, it applied the Eighth Amendment to invalidate, respectively, the death penalty for juvenile offenders under age 18, *Roper v. Simmons*, 543 U.S. 551, 572-73, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); the sentence of life without parole for juvenile nonhomicide offenders, *Graham*, 560 U.S. at 88; and any mandatory sentence of life without parole for juvenile homicide offenders, *Miller v. Alabama*, 567 U.S. 460, 489, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The science relied on in the decisions was summarized in *Miller*:

> *Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." *Graham*, 560 U.S., at 68, 130 S. Ct., at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S. Ct. 1183. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.*, at 570, 125 S. Ct. 1183.

8

567 U.S. at 471 (alterations in original).  *Miller* held that "a judge or jury must have the opportunity to consider mitigating circumstance before imposing the harshest possible penalty for juveniles."  *Id*. at 489.

Mr. Lauderdale's sentence for aggravated murder was imposed under former RCW 10.95.030(1) (1993), which provided that "[e]xcept as provided in subsection (2) of this section [which imposed the death penalty in cases not meriting leniency], *any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole*."  (Emphasis added.)  Further driving home the mandatory nature of the sentence, the statute continued:

> A person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer and the indeterminate sentence review board or its successor may not parole such prisoner nor reduce the period of confinement in any manner whatsoever including but not limited to any sort of good-time calculation. The department of social and health services or its successor or any executive official may not permit such prisoner to participate in any sort of release or furlough program.

To comply with *Miller*, the Washington Legislature amended RCW 10.95.030 in 2014 to include special provisions for juveniles convicted of aggravated first degree murder.  As amended, courts sentencing persons convicted of aggravated first degree murder for an offense committed prior to the person's 18th birthday now impose an indeterminate sentence, with a maximum term of life imprisonment but a minimum term of as little as 25 years.  Those committing such a murder before their 16th birthday

9

receive a 25 year minimum term. Those committing such a murder after their 16th birthday but before their 18th birthday receive a minimum term of *no less than* 25 years. RCW 10.95.030(3)(a)(ii). The statute provides that in setting the minimum term, the court "must take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*." RCW 10.95.030(3)(b).

The legislature also adopted RCW 10.95.035(1), which provides that persons who were earlier sentenced to a term of life without the possibility of parole "for an offense committed prior to their eighteenth birthday" shall be returned to court for sentencing consistent with RCW 10.95.030. The provision plainly does not apply to Mr. Lauderdale, who was approaching 19 years and 8 months old when he murdered Mr. Wood.

The United States Supreme Court has consistently drawn a bright line at age 18 for youth-based limitations on sentencing discretion. *See Miller*, 567 U.S. at 465 ("[M]andatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"); *Roper*, 543 U.S. at 578 (holding that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed"; *Graham*, 560 U.S. at 74 (citing *Roper*'s recognition of the age of 18 as "the point where society draws the line for many purposes between childhood and adulthood"). Asked to extend *Miller* to defendants who were 18 or older at the time of their offenses, every federal circuit court to consider the issue has refused. *See, e.g.,*

10

*United States v. Sierra*, 933 F.3d 95, 97 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2540, 206 L. Ed. 2d 480 (2020); *United States v. Dock*, 541 F. App'x 242, 245 (4th Cir. 2013); *United States v. Chavez*, 894 F.3d 593, 609 (4th Cir.), *cert. denied*, 139 S. Ct. 278, 202 L. Ed. 2d 184 (2018); *In re Frank*, 690 F. App'x 146 (5th Cir. 2017); *United States v. Marshall*, 736 F.3d 492, 498-500 (6th Cir. 2013), *cert. denied*, 573 U.S. 922, 134 S. Ct. 2832, 189 L. Ed. 2d 795 (2014); *Wright v. United States*, 902 F.3d 868, 872 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 1207, 203 L. Ed. 2d 232 (2019); *Melton v. Florida Dep't of Corr.*, 778 F.3d 1234, 1235, 1237 (11th Cir. 2015).

The Eighth Amendment cases cited by Mr. Lauderdale do not hold or imply that a State may not mandate life without possibility of parole sentences on adult murderers.

*Brain science as supporting a mitigated exceptional sentence under the SRA*

Although citing the Eighth Amendment cases, Mr. Lauderdale principally argues that the trial court failed to recognize discretion that exists by virtue of the Washington Supreme Court's decision in *State v. O'Dell*, 183 Wn.2d 680, 696, 358 P.3d 359 (2015). That case involved sentencing under the SRA, however, and specifically whether youth is a factor that legally supports a departure from the standard sentence range.

RCW 9.94A.535 provides that the court may impose a sentence outside the standard sentence range for an offense if it finds substantial and compelling reasons justifying an exceptional sentence. RCW 9.94A.535(1) provides a nonexclusive list of mitigating circumstances that justify a sentence below the standard range. To determine

11

whether a circumstance that is not on the list supports departure from the standard sentence range, courts apply a two-part test. "First, a factor cannot support the imposition of an exceptional sentence if the legislature *necessarily* considered that factor when it established the standard sentence range," and "[s]econd, . . . a factor must be 'sufficiently substantial and compelling to distinguish the crime from others in the same category.'" *O'Dell*, 183 Wn.2d at 690 (quoting *State v. Alexander*, 125 Wn.2d 717, 725, 888 P.2d 1169 (1995)).

In *O'Dell*, our state Supreme Court held that youth can qualify as a mitigating factor under this test, even for defendants who commit crimes at age 18 or older, and even absent evidence that the defendant's youth actually affected his actions. The court reassessed prior decisions holding otherwise because they were made without the benefit of the modern scientific literature discussed in *Miller*. *Id.* at 695. *And see State v. Houston-Sconiers*, 188 Wn.2d 1, 9, 22, 391 P.3d 409 (2017) (neither the "*Miller*-fix" nor enhancement statutes prevented trial court from imposing exceptional sentences on juvenile defendants whose charges brought them automatically into adult court).

Mr. Lauderdale's sentence was governed by RCW 10.95.030 rather than the SRA, however, so RCW 9.94A.535 has no application. The judicial discretion that the legislature has granted to courts sentencing under the SRA has been withheld from courts sentencing persons age 18 and older under RCW 10.95.030.

12

*Article I, section 14 of the Washington Constitution*

Finally, Mr. Lauderdale cites *State v. Bassett*, 192 Wn.2d 67, 428 P.3d 343 (2018),

in which our Supreme Court held that the greater protection against "cruel punishment"

provided by article I, section 14 of the Washington Constitution than is provided by the

Eighth Amendment to the United States Constitution has consequences for RCW

10.95.030. He quotes *Bassett* as holding that the Washington constitutional provision

"prohibits sentencing juveniles to life without the possibility of parole, rendering RCW

10.95.030(a)(ii) unconstitutional," but without identifying the context. Br. of Appellant

at 9. *Bassett* declared the provision unconstitutional in only one respect: for courts

sentencing juveniles over age 16 for aggravated first degree murder, it invalidated the

court's discretion to set life without parole as the *minimum* term of confinement. *Bassett*,

192 Wn.2d at 91. *Miller* had not foreclosed life without parole sentences for juveniles.

*Bassett* did not hold or imply that RCW 10.95.030 was unconstitutional in

mandating life without parole for persons who were 18 or older at the time they

committed aggravated first degree murder.

To summarize, Mr. Lauderdale relies on brain science that might ultimately

persuade the Washington Legislature (for statutory purposes) or lead to a consensus (for

federal and state constitutional purposes) that characteristics of his 19 year and 8 month

13

brain at the time he murdered Mr. Wood entitle him to resentencing.[1]  Mr. Lauderdale

fails to identify any legal basis on which Judge Ferrera could have imposed a sentence

other than life without the possibility of parole, however.  Accordingly, the lawyer

representing Mr. Lauderdale at the resentencing did not provide deficient representation

in failing to advocate for a different sentence.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds, Mr. Lauderdale raises four.  His

second—that his lawyer at the resentencing provided ineffective assistance of counsel by

failing to advocate for an alternative sentence—was adequately addressed by counsel and

need not be addressed further.  *See* RAP 10.10(a).  We address the remaining three.

*Lack of a neutral fact finder.*  Mr. Lauderdale argues that Judge Ferrera was not a

neutral fact finder and exhibited bias.  He points to (1) the fact that at the hearing on the

State's motion to limit his resentencing, Judge Ferrara briefly recessed to consult Judge

Allan about her intention in ordering the resentencing, and (2) Judge Ferrara's apologies

to Mr. Wood's family and friends for "having to go through this again."  RP (May 30,

2019) 45.

---

[1] Research continues in this important area.  *See, e.g.*, Grace Icenogle, et al., *Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for a "Maturity Gap" in a Multinational, Cross-Sectional Sample*, 43 L. & HUM. BEHAV. 69, 83 (2019) ("The present study reaffirms the complexity of defining 'maturity' or 'adulthood' based on psychological grounds alone.  Developmental science ought to inform, but not dictate, where the law sets age boundaries.").

With respect to Judge Ferrara consulting Judge Allan, Mr. Lauderdale argues that defendants have a right "to have factual disputes resolved by a neutral fact finder." *State v. Marino*, 100 Wn.2d 719, 725, 674 P.2d 171 (1984). Whether the court would conduct a full resentencing or make a ministerial correction presented a legal issue, not a factual dispute. Mr. Lauderdale does not explain why attempting to discern the meaning of an earlier ruling by another judge demonstrates a lack of neutrality. In any event, as Judge Ferrera reported after the brief recess, Judge Allan "[did] not feel the need to weigh in." RP (May 30, 2019) at 25.

Mr. Lauderdale argues Judge Ferrara's apologies to Mr. Wood's family and friends demonstrated bias and argues that due process, the appearance of fairness doctrine and the Code of Judicial Conduct require a judge to disqualify herself if she is biased against a party or her impartiality may reasonably be questioned. *State v. Dominguez*, 81 Wn. App. 325, 328, 914 P.2d 141 (1996). Prejudice is not presumed, so a party must support a claim of bias with evidence. *Id.* at 328-29; *e.g.*, *State v. Gamble*, 168 Wn.2d 161, 188, 225 P.3d 973 (2010) (comments about the strength of the State's evidence made outside the presence of the jury are not evidence of bias). If a party presents sufficient evidence of bias, "[t]he test is whether a reasonably prudent and disinterested observer would conclude [the party] obtained a fair, impartial, and neutral trial." *Dominguez*, 81 Wn. App. at 330.

15

Mr. Lauderdale made similarly apologetic remarks to Mr. Wood's family and friends during his allocution. *See* RP (May 30, 2019) at 41. The statements cited by Mr. Lauderdale are not evidence of bias.

*"Invited error" and "prosecutorial misconduct."* Mr. Lauderdale argues it is a "manifest injustice" that the consideration of youth available to juveniles under the Eighth Amendment and to young adults sentenced under the SRA is not given to defendants in his situation. While explaining why he believes the law should be otherwise, Mr. Lauderdale fails to cite relevant legal authority and provide reasoned argument explaining why we can and should disregard plain statutory language and clear precedent. RAP 10.3(a)(5); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) (an argumentative assertion with a lack of reasoned argument does not merit judicial consideration).

## PERSONAL RESTRAINT PETITION

Finally, we turn to the issue in Mr. Lauderdale's CrR 7.8 motion that was transferred to us for consideration as a PRP.

At the time of Mr. Wood's murder, and continuing to today, a person is guilty of aggravated first degree murder if he or she commits premediated murder as provided by RCW 9A.32.030(1)(a) and a statutory aggravating circumstance exists. RCW 10.95.020 and former RCW 10.95.020 (1994). The aggravating circumstance relied on by the State in Mr. Lauderdale's case was that the murder was committed in the course of, in

furtherance of, or in immediate flight from rape in the first or second degree. Former

RCW 10.95.020(9)(b) (1994).

Upon transfer to the Court of Appeals, a CrR 7.8 motion becomes subject to the

rigorous pleading standards applicable to personal restraint petitions set forth in RAP

16.7. *In re Pres. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 639, 362 P.3d 758 (2015).

We will grant relief if petitioners "show that they were actually and substantially

prejudiced by constitutional error or that their trials suffered from a fundamental defect of

a nonconstitutional nature that inherently resulted in a complete miscarriage of justice."

*In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). "It is the

petitioner's burden to establish this 'threshold requirement.'" *In re Pers. Restraint of*

*Moncada*, 197 Wn. App. 601, 605, 391 P.3d 493 (2017) (quoting *In re Pers. Restraint of*

*Woods*, 154 Wn.2d 400, 409, 114 P.3d 607 (2005)).

For a petitioner to meet this burden, "a PRP must present competent evidence in

support of its claims." *Id.* The petitioner is required to "identify 'the evidence available

to support the factual allegations' and why the petitioner is entitled to collateral relief for

one or more reasons listed in RAP 16.4(c)." *Ruiz-Sanabria*, 184 Wn.2d at 639 (quoting

RAP 16.7(a)(2)(i)). It is a well established principle that

> "[o]n a partial or incomplete record, the appellate court will presume any
> conceivable state of facts within the scope of the pleadings and not
> inconsistent with the record which will sustain and support the ruling or
> decision complained of; but it will not, for the purpose of finding reversible
> error, presume the existence of facts as to which the record is silent."

17

*State v. Jasper*, 174 Wn.2d 96, 123-24, 271 P.3d 876 (2012) (alterations in original)

(quoting *Barker v. Weeks*, 182 Wash. 384, 391, 47 P.2d 1 (1935)).

Lacking a trial transcript, Mr. Lauderdale places principal reliance on a statement

in this court's 1996 opinion and on a copy of Dr. Rappe's autopsy report.  This court

stated in the opinion, "Since [Dr. Rappe] found no trauma to the anus or rectum the

doctor believed sex occurred after the victim was dead."  Lauderdale, 1996 WL 538806,

at *2.  Dr. Rappe's autopsy report states in relevant part:

> The rather loose bindings to the ankles appear to have been either
> postmortem or else the decedent was voluntarily bound antemortem
> and never struggled against them.  There are no abrasions or contusions
> associated with these bindings.
>
> Postmortem anal penetration is quite possible with no signs of injury
> whatever.

CP at 36.  Mr. Lauderdale argues that evidence penetration occurred after Mr. Wood was

dead would not establish first or second degree rape because it would not be a crime

against a person.

At the time Mr. Wood was killed, first degree rape was defined by former RCW

9A.44.040(1) (1983), which provided that a person was guilty of first degree rape

> when such person engages in sexual intercourse with another person by
> forcible compulsion where the perpetrator or an accessory:
>> (a) Uses or threatens to use a deadly weapon or what appears to be a
> deadly weapon; or
>> (b) Kidnaps the victim; or

(c) Inflicts serious physical injury; or

(d) Feloniously enters into the building or vehicle where the victim
is situated.

"Forcible compulsion" was then defined to mean, as it does now, "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." Former RCW 9A.44.010(6) (1993).

Former RCW 9A.44.050(1) (1993) provided that a person was guilty of second degree rape in five circumstances, two of which are relevant here:

when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person:

(a) By forcible compulsion;

(b) When the victim is incapable of consent by reason of being physically helpless or mentally incapacitated.

The test for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences from the evidence are drawn in favor of the State and are interpreted strongly against the defendant. *Id.*

Contrary to Mr. Lauderdale's argument, there are conceivable states of fact, not inconsistent with the record, which will sustain the jury's verdict. Mr. Lauderdale told police that Mr. Wood was alive when the two had anal intercourse. If Mr. Wood

submitted to anal intercourse because Mr. Lauderdale threatened him with a baseball bat—a deadly weapon—the intercourse might not cause injury. Mr. Lauderdale told officers that he had used a condom and baby oil as a lubricant, and both were found in the vicinity of the couch. If threats of force were used to take Mr. Wood to a remote location and tie him up, a finding of kidnaping would support a finding of first degree rape.[2] And, of course, serious physical injury was inflicted on Mr. Wood.

Alternatively, jurors could have concluded that Mr. Wood was incapable of consent by being physically helpless. Mr. Lauderdale told officers that Mr. Wood had consumed quite a lot of alcohol and smoked marijuana at the party, was quite intoxicated, had passed out on the couch, and that Mr. Lauderdale had a hard time getting him awake and getting him back through the fence to the pullout area where the car was parked. The host of the party Mr. Lauderdale and Mr. Wood attended said that when Mr. Wood left, his condition was "shitty," which he clarified as meaning real intoxicated to the point that his eyes would roll back in his head. CP at 40. That Mr. Wood was extremely

---

[2] At the time of the crime, "kidnap" was not defined in the rape statute and first and second degree kidnaping were crimes. Former RCW 9A.40.010(1) (1975). In *State v. Pawling*, 23 Wn. App. 226, 229-32, 597 P.2d 1367 (1979), the Washington Supreme Court, presented with a challenge to how kidnaping had been defined when charged as an element of a first degree rape, had approved the following instruction:

> A person commits kidnapping [sic] when he intentionally abducts another person. "Abduct means to restrain a person by either (a) secreting or withholding the person in a place where that person is not likely to be found or (b) using or threatening to use deadly force."

20

intoxicated is also corroborated by Dr. Rappe's report that Mr. Wood's blood ethanol level was 0.30 g/100 ml, almost four times the legal limit.

Dr. Rappe's report merely stated that "[p]ostmortem anal penetration is *quite possible* with no signs of injury whatever." CP at 36 (emphasis added). His report did not address the possibility that there were no signs of injury because Mr. Wood offered no resistance, either because he was being threatened with a deadly weapon or because he had passed out.

Mr. Lauderdale fails to present competent evidence that the State failed to prove the aggravated first degree murder charge.

Mr. Lauderdale's 2019 amended judgment and sentence is affirmed. His PRP is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Korsmo, A.C.J.

No. 37141-7-III cons. with No. 36744-4-III

FEARING, J. (concurring) — Michael Lauderdale's petition for review raises the question: does cruel and unusual punishment clause strictures demand that the sentencing court be permitted to consider the youth of a nineteen-year-old convicted of aggravated first degree murder, such that the court can impose a sentence other than life without the possibility of parole? Conversely, must a Washington State sentencing court, pursuant to RCW 10.95.030(1), always sentence an offender who commits aggravated first degree murder at the age of 18 or above to a sentence of life without parole? The two questions challenge the constitutionally of RCW 10.95.030(1) when applied to a young adult. Science supports an affirmative answer to the first question and a negative answer to the second question. Principles emanating from United States Supreme Court decisions on the subject of youth offenders and rationales behind the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution provide the same answers. Case law disagrees.

RCW 10.95.030(1) governs this appeal. The statute declares:

> Except as provided in subsections (2) and (3) of this section, any person convicted of the crime of aggravated first degree murder *shall be sentenced to life imprisonment without possibility of release or parole*. A

> person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer and the indeterminate sentence review board or its successor may not parole such prisoner nor reduce the period of confinement in any manner whatsoever including but not limited to any sort of good-time calculation. The department of social and health services or its successor or any executive official may not permit such prisoner to participate in any sort of release or furlough program.

(Emphasis added.) RCW 10.95.030(3), in turn, allows a sentence lesser in degree than life for one, who, while under the age of eighteen, commits the aggravated murder. When sentencing a juvenile convicted of aggravated first degree murder, the court must consider:

> mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*, [567 U.S. 460,] 132 S. Ct. 2455 [183 L. Ed. 2d 407] (2012) including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

RCW 10.95.030(3)(b).

Petitioner Michael Lauderdale committed aggravated first degree murder at age 19. He requests, however, that we reverse his life without the possibility of parole sentence and remand for the resentencing court to consider reducing his sentence because of his youthful age.

The United States Supreme Court has announced various underlying principles for the assessment of when a punishment violates the Eighth Amendment. I mention two of those guiding conventions. First, the Eighth Amendment's cruel and unusual punishment clause prohibits grossly disproportionate sentences based on the nature of the offense or

2

the characteristics of the offender. *Weems v. United States*, 217 U.S. 349, 367, 30 S. Ct. 544, 54 L. Ed. 793 (1910). A sentence disproportionate to the crime or undeserving of the offender constitutes cruel and unusual punishment. Second, a sentence that serves no penological purpose constitutes cruel and unusual punishment. *Graham v. Florida*, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 571, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). Stated differently, a sanction is beyond the State's authority to inflict if it makes no measurable contribution to acceptable penal goals. *Weems v. United States*, 217 U.S. at 367. Life sentences for those age 19 at the time of the crime, even aggravated first degree murder, will generally contravene both of these rationales behind the cruel and unusual punishment clause because of the characteristic of the offender and a disconnect with goals behind punishment.

The United States Supreme Court has declared that children are "constitutionally different" from adults for purposes of sentencing. *Miller v. Alabama*, 567 U.S. 460, 471, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). In *Miller*, the Court strongly inferred, if not held, that no juvenile could receive a lifetime sentence for any crime unless the sentencing court finds the juvenile to be a "rare juvenile offender whose crime reflects irreparable corruption." *Miller v. Alabama*, 567 U.S. at 479-80. Because of the constitutional nature of children, including teenagers, the *Miller* Court mandated that a sentence follow a process that incorporates consideration of the offender's chronological age and its hallmark features and other mitigating features before imposing life without parole. The attended characteristics include: chronological age, immaturity, impetuosity,

3

failure to appreciate risks and consequences, the surrounding family and home environment, the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and any pressures from friends or family affecting him, the inability to deal with police officers and prosecutors, incapacity to assist an attorney in his or her defense, and the possibility of rehabilitation. *Miller v. Alabama*, 567 U.S. at 477; *State v. Houston-Sconiers*, 188 Wn.2d 1, 23, 391 P.3d 409 (2017). The United States Supreme Court did not rule that any one factor controls.

The United States Supreme Court, in *Miller v. Alabama* and other decisions, has explained the reason behind distinctive sentencing for youth. Adolescent brains are not yet fully mature in regions and systems related to higher order executive functions such as impulse control, planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. at 475 n.5. Children's lack of maturity and an underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless risk taking. *Miller v. Alabama*, 567 U.S. at 471. Children are more vulnerable to negative influence and outside pressure from family and peers, have limited control over their environments, and lack the ability to extricate themselves from horrific, crime-producing settings. *Miller v. Alabama*, 567 U.S. at 471. Because a child's character is not as well-formed as an adult's, the child's traits are less fixed, and his actions are less likely to be evidence of irretrievable depravity. *Miller v. Alabama*, 567 U.S. at 471. Only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. *Roper v. Simmons*, 543 U.S. at 570 (2005).

4

Because of the nature of adolescence, lifetime sentences of juvenile offenders, even when committing a horrible crime, do not further penological goals. *Miller v. Alabama*, 567 U.S. at 472. Deterrence supplies a flawed rationale for punishment because of juveniles' impulsivity and inability to consider the consequences of their actions. *Miller v. Alabama*, 567 U.S. at 472. Retribution's focus on blameworthiness does not justify a life without parole sentence because juveniles have severely diminished moral culpability. *Miller v. Alabama*, 567 U.S. at 472. Incapacitation fails to justify a long sentence because adolescent development diminishes the likelihood that an offender forever will be a danger to society. *Miller v. Alabama*, 567 U.S. at 472-73. Finally, rehabilitation does not justify a life without parole sentence because such a sentence precludes hope for a child's ultimate rehabilitation. *Miller v. Alabama*, 567 U.S. at 473.

A lifetime sentence not only conflicts with the rationales behind criminal justice, but also thwarts the aims of punishment. For youth, life without parole presents an especially harsh punishment because the juvenile will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender. In *Graham v. Florida*, 560 U.S. 48 (2010), the Court likened life without parole sentences to the death penalty for juveniles. The *Graham* Court observed:

> [A] categorical rule [barring life without parole sentences] gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. . . . Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the

5

> foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual. In some prisons, moreover, the system itself becomes complicit in the lack of development. . . . A categorical rule against life without parole for juvenile nonhomicide offenders avoids the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term.

*Graham v. Florida*, 560 U.S. at 79.

*Graham v. Florida* noted that corrections facilities often deny defendants serving life without parole with access to vocational training and other rehabilitative services that are available to other inmates. For juvenile offenders, who are most in need of and receptive to rehabilitation, the absence of rehabilitative opportunities or treatment makes the disproportionality of the sentence all the more evident. *Graham v. Florida*, 560 U.S. at 74.

As a general rule under Washington precedent, sentencing courts, in order to comply with the Eighth Amendment, must consider the mitigating qualities of youth in order to impose a proportional punishment based on immature qualities. *State v. Houston-Sconiers*, 188 Wn.2d 1, 19 n.4 (2017). In turn, sentencing courts must exercise discretion, and they hold authority, to impose any sentence below the otherwise applicable Sentencing Reform Act of 1981 (SRA), ch. 9.94a RCW, range or sentence enhancements. *In re Personal Restraint of Ali*, 196 Wn.2d 220, 226, 474 P.3d 507 (2020).

Michael Lauderdale was age 19 at the time of his crime. Science and legal decisions recognize that the cognitive traits that distinguish juveniles from adults do not

6

disappear when an individual turns 18. *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018). Immaturity and childishness do not end at age seventeen. The parts of the brain involved in behavioral control continue to develop well into a person's twenties. *State v. O'Dell*, 183 Wn.2d 680, 692 n.5, 358 P.3d 359 (2015). The dorsal lateral prefontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early twenties. *State v. O'Dell*, 183 Wn.2d at 692 n.5.

In *State v. O'Dell*, 183 Wn.2d 680 (2015), the Washington high court directed that the sentencing court consider the youth of an 18-year old, despite his being of the age of majority, when sentencing for the crime of child rape. The court ruled that, even if the offender is eighteen years to some unidentified age in his or her twenties, the sentencing court must consider the youth of the offender regardless of the standard range imposed by the SRA. *State v. O'Dell*, 183 Wn.2d at 693. In such circumstances, the age of the offender can support an exceptional sentence below the standard range applicable to an adult felony defendant. *State v. O'Dell*, 183 Wn.2d at 698-99.

Despite the same considerations being relevant to one committing murder at age 19 as to one committing the horrific crime at age 17, courts have arbitrarily limited the *Miller v. Alabama* sentencing considerations for youth to those under the age of 18 when prosecuted for murder. This practice follows contemporary society's drawing of a line for many purposes between childhood and adulthood at 18 years old. *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *United States v. Chavez*, 894 F.3d 593, 609. Despite noting

7

the continued formation of the brain into a person's twenties, the Washington Supreme Court has not accepted the need and benefit of allowing one age 18 and above to present evidence of immaturity and impulsiveness when being sentenced for aggravated murder.

This court's majority cites a number of decisions wherein federal appeals courts held that a sentencing court need not consider the offender's youth beyond the age of 17 no matter the nature of the crime. Numerous state appellate decisions also follow this rule: *Commonwealth v. Johnson*, 486 Mass. 51, 155 N.E.3d 690 (2020); *People v. Montelongo*, 55 Cal. App. 5th 1016, 269 Cal. Rptr. 3d 883 (2020); *State v. Barnett*, 598 S.W.3d 127 (Mo. 2020); *State v. Perkins*, 600 S.W.3d 838 (Mo. Ct. App. 2020); *Geoppo v. State*, 283 So.3d 852 (Fla. Dist. Ct. App. 2019); *Commonwealth v. Blount*, 2019 Pa Super 108, 207 A.3d 925; *Schuler v. State*, 112 N.E.3d 180 (Ind. 2018); *State v. Mukhtaar*, 179 Conn. App. 1, 177 A.3d 1885 (2017); *Alexander v. Kelley*, 2017 Ark. 130, 516 S.W.3d 258; *People v. Thomas*, 2017 IL App (1st) 142557, 74 N.E.3d 127, 411 Ill. Dec. 818 (2017); *State v. Bates*, 464 S.W.3d 257 (Mo. Ct. App. 2015); *People v. Benson*, 119 A.D.3d 1145, 990 N.Y.S.2d 321 (2014); *Romero v. State*, 105 So.3d 550 (Fla. Dist. Ct. App. 2012).

Even under the circumstances when a disabled eighteen-year-old possessed child pornography, one federal court refused to consider the offender a youth for purposes of the Eighth Amendment. *United States v. Marshall*, 736 F.3d 492, 499 (6th Cir. 2013). Dylan Marshall suffered from a growth hormone deficiency, and, as a result, he faced both physiological and psychological deficits. One psychologist, who tested Marshall,

concluded he had a mental age of 15 1/2. The district court explicitly found him to be a mental and physical juvenile. *United States v. Marshall* conflicts with our high court's decision in *State v. O'Dell*, 183 Wn.2d 680 (2015).

Based on current Washington law, a person, who commits aggravated murder at age 17 and 364 days, receives the benefit of scientific advances in brain science, but not one age 18. Life without the possibility of parole could depend on whether the crime occurs at the stroke of midnight on the offender's birthday, rather than at 11:59 p.m. on birthday eve. But the Eighth Amendment abhors such arbitrary sentencing distinctions. The law should be changed. RCW 10.95.030(1) should be declared unconstitutional as applied to a youth above the age of 17.

A developmentally disabled individual, despite being over 18 years of age, cannot be executed under cruel and unusual punishment principles. *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). The Supreme Court grounds its youth principles on the proposition that the diminished mental capabilities of juveniles and mentally retarded persons as the central justification for its categorical restrictions on types of sentences for classes of individuals. This rationale applies to youth over the age of 17.

One of the goals of the SRA is consistency in punishment of those committing similar offenses. RCW 9.94A.010(3). Still, at least in the context of capital punishment, the Eighth Amendment compels the jury to ponder the uniqueness of each individual defendant. *Kansas v. Marsh*, 548 U.S. 163, 205, 126 S. Ct. 2516, 165 L. Ed. 2d 429

9

(2006); *Zant v. Stephens*, 462 U.S. 862, 879, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).

Arbitrary sentencing decisions based on chronological age, as demanded by RCW

10.95.030(1), violate the constitutional demand of individualized treatment.

In reaction to concerns about life sentences for youth above the age of 18, courts

respond that the line must be drawn somewhere. But it does not need to be drawn at 17,

when science unmistakably considers older individuals to hold the same characteristics as

teenagers. The sentencing court could entertain evidence presented by the parties and

weigh the various *Miller* factors to determine if the offender above age 17 qualifies as a

youth for purposes of sentencing.

Courts sentencing youth 18 years of age or older emphasize historically common

distinctions made by the law at age 18, including requirements for driving, drinking

alcohol, registering for the draft, voting, holding certain public offices, and marrying,

among other things. *United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018); *United

States v. Marshall*, 736 F.3d 492, 499. Interestingly, courts offer imbibing of alcohol as

an example, but in Washington State the legal age for drinking is 21. RCW 66.44.270.

Courts also answer that some individuals under age 18 have already attained a

level of maturity some adults will never reach. *United States v. Chavez*, 894 F.3d 593,

609; *United States v. Marshall*, 736 F.3d 492, 499. Assuming this factual contention to

be true, the argument goes nowhere in discounting the propriety of imposing a life

without the possibility of parole sentence to one above the age of 18 who has not reached

an adult's development. In the rare instance when a 17-year-old has reached adult

maturation, the sentencing court has discretion, after reviewing the circumstances of the crime and the psychological profile of the offender, to impose a sentence of life without the possibility of parole if the court finds the juvenile to be irretrievably depraved. *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 733, 193 L. Ed. 2d 599 (2016). If the court remains free to assess the maturity of an offender under the age of 18, the court should possess discretion to weigh maturity after the age of 17. The arbitrary milepost of age 18 should not work only in one direction.

One court has deemed assessing the maturation of one above the age of seventeen to be unmanageable. *United States v. Marshall*, 736 F.3d 492, 499 (6th Cir. 2013). The federal court of appeals complained that, before a court could impose on a defendant over 18, those punishments constitutionally barred from being imposed on juveniles, the court would first have to wade through "tedious expert testimony" to determine whether the defendant's mental age was commensurate with his chronological age. *United States v. Marshall*, 736 F.3d 492, 499. I do not understand why the court characterized the evidence as "tedious," when courts frequently review psychological testimony. I recognize sentencing courts would need to spend additional time when conducting a sentencing hearing under my proposed rule, but Washington State has diligent trial court judges. Washington's excellent superior courts will not shy from their responsibilities of applying constitutional provisions because of the time-consuming nature of the task.

Even if the Eighth Amendment to the United States Constitution does not preclude a life without the possibility of parole for a nineteen-year-old, at least the Washington

11

constitution should. The Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Washington Constitution provides that "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." WASH. CONST. art. I, § 14. The Washington provision echoes the Eighth Amendment but omits the words "and unusual." This difference indicates that article I, section 14, on its face, offers greater protection than the Eighth Amendment, because the former prohibits conduct that is merely cruel. *State v. Bassett*, 192 Wn.2d 67, 80, 428 P.3d 343 (2018). The Washington proviso does not require that the punishment be both cruel and unusual. *State v. Dodd*, 120 Wn.2d 1, 21, 838 P.2d 86 (1992). Sentencing one to a lifetime in confinement for even a dreadful crime committed as a youth may be usual, but it is cruel.

As a Court of Appeals judge, I am bound by the decisions of the United States Supreme Court and the state Supreme Court. I do not know if the United States Supreme Court will accept the proposition that a sentencing court must consider the immaturity of a 19-year-old before dispensing a life without parole sentence. Also, I anticipate that, based on its current jurisprudence, the Washington Supreme Court will not declare RCW 10.95.030(1) unconstitutional as applied to youth above the age of 17. Therefore, I concur in the majority's decision.

I CONCUR:

_____Fearing, J._____
Fearing, J.

12