# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Rashawn Vertez Carter, Appellant.

Appellate Case No. 2018-000358

―――――――――

Appeal From Aiken County
Doyet A. Early, III, Circuit Court Judge

―――――――――

Opinion No. 5954
Heard October 14, 2020 – Filed November 30, 2022

―――――――――

**AFFIRMED**

―――――――――

Appellate Defender David Alexander, of Columbia, for
Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Joshua Abraham Edwards, both of
Columbia, and Solicitor John William Weeks, of Aiken;
all for Respondent.

―――――――――

**MCDONALD, J.:** Rashawn Vertez Carter appeals his convictions for first-degree
burglary, kidnapping, armed robbery, and illegal possession of a firearm, arguing
the circuit court erred in admitting evidence gleaned from law enforcement's
warrantless use of Carter's cell phone to track his real-time location. Carter further
contends the circuit court erred in admitting the unredacted video of his interview
with police because the recording was replete with hearsay, accusations Carter was
lying, and burden-shifting comments. Because the erroneous admission of the

unredacted interview video (Interview Video) could not reasonably have affected the result of Carter's trial, we affirm his convictions.

**Facts and Procedural History**

Elizabeth Miller lived with her three children in a duplex in the Hahn Village apartment complex in Aiken; her boyfriend, Melvin Chandler, occasionally stayed with them. Miller was aware Chandler sold drugs but claimed she did not allow him to sell drugs from her apartment. Instead, Chandler used a nearby house on Columbia Avenue (the trap house), around the corner from Hahn Village, to sell his product. In the early morning hours of May 9, 2015, three men looking for Chandler's money robbed Miller at her apartment.

The night before the armed robbery, Whitney Simpkins loaned Carter her silver rental car, which he picked up around 10:30 p.m. Carter, Patrick Neely, and Rodriquez Jackson then went joyriding in Aiken and Augusta, Georgia. While in Aiken, the trio drove around Hahn Village and some other apartments, stopped by "a crack head house" and then returned to Augusta. After a phone call to Darius Scruggs, Neely's half-brother, to discuss hitting a "lick" (a robbery), they picked up Scruggs and met Rick Jackson at Club Climax. Rick and another man followed them to the Jennings Homes apartment complex, where the group met to discuss the proposed robbery. Carter, Scruggs, Neely, Rick, and Rodriquez then got into the rental car, and Carter dropped Neely off at his apartment. Neely claimed the group took him home because Scruggs did not want Neely to participate in the robbery. Neely explained, "We had a[n] argument. He asked for the gun to give to Shawn [Carter]. I gave him the gun. He said don't worry about it, we'll be straight. I'll call you when I get back."

Carter, Neely, Rick, Rodriquez, and Scruggs next drove to Aiken, where they took Rick to Chandler's Columbia Avenue trap house.[1] Chandler testified a gray or silver car dropped Rick off at the house. While there, Rick and Scruggs exchanged several text messages detailing Chandler's movements, and Rick notified Scruggs when Chandler left the house to meet someone.

Three armed men with t-shirts over their heads then broke into Miller's apartment, rushed into her room, pointed guns at her face, and asked "where the bread at?"[2]

---

[1] Rick and Chandler had spoken on the phone earlier that night.

[2] Miller's children were staying at a friend's house.

One assailant remained with Miller while the other two men ransacked her home. Miller attempted to unlock her phone but one of the men took it from her. They then forced Miller to lie on her stomach and one man sexually assaulted her with a handgun. The next thing Miller remembered was one of the men saying "Oh, s\*\*t" before everything "got quiet." When Miller realized she was alone and ran from her bedroom, she saw an unconscious man, later identified as Scruggs, on the bathroom floor. As Miller fled to her neighbor's house, she heard gunshots.

Around the same time, Keith Byrd went outside to smoke on his back porch. When Byrd saw three people headed towards Miller's house with their faces covered, he called Chandler.[3] Chandler then called two friends, "G" and "Trill." When Chandler arrived at Miller's home, he saw her fleeing the apartment. Miller got into Chandler's Chevrolet Tahoe and called 911.[4]

After the men fled, several of Miller's neighbors came outside, including Treasure Simpkins and her daughter Jasmine Hammond, Carter's girlfriend. Hammond and Treasure were out looking for Carter because he was not answering Hammond's calls. While walking down the street, the women saw Trill running away from Hahn Village. They then saw the police cars and ambulances outside Miller's apartment.

When Aiken Department of Public Safety (ADPS) officers arrived, they found Scruggs unconscious with a gunshot wound to the head. Officers carried Scruggs outside and attempted to render medical aid. Other officers spoke with bystanders at the scene, including Treasure and Hammond, and recorded their names and contact information.

ADPS Sergeant Robert Comer searched Miller's apartment and found ten to fifteen bullet casings, a bullet hole in the back door, and fresh tire tracks in the Hahn Village pathway to McCormick Street. Officers recovered a Taurus handgun and found three plastic baggies filled with cocaine in a shoebox in a bedroom closet.

EMS transported Scruggs to the hospital, where he later died. When Robert Henderson, Scruggs's father, was notified that Scruggs had suffered a gunshot

---

[3] An examination of Byrd's phone established he called Chandler at 5:07 a.m. and 5:10 a.m. that morning.

[4] Law enforcement received the 911 call at 5:24 a.m.

wound to the head, he called Scruggs's brother, Neely, and "demanded that he come clean." Neely told him to talk to Rick Jackson and gave him Rick's phone number. Henderson called Rick several times and eventually spoke with him by phone and in person about what happened to his son. While at the hospital, ADPS Lieutenant William Cameron met with Scruggs's family and gathered phone numbers associated with Rick, Neely, and Carter. Henderson also gave him Scruggs's cell phone information.

Around 7:15 a.m., Carter and Rick returned the rental car to Whitney and asked her to take Carter to see his cousin in Augusta. While in Augusta, Carter used a friend's phone to call Neely. When Neely came to the Augusta apartment, Carter told Neely that Scruggs was "gone."

While Carter was with his cousin, Whitney picked up Hammond and returned to the Augusta apartment. After making several stops, Carter and Hammond drove to Columbia to see Hammond's sister. On the way, Carter told Hammond he had been involved in a home invasion as the driver of the vehicle and "the dude that was running it [was] shot in the head."

Meanwhile, after completing an "exigent request" to Carter's cell phone provider, T-Mobile, law enforcement tracked Carter to Columbia using real time cell site location information (CSLI). Agent Matthew Morlan of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Detective Carlos Colindres of ADPS testified Carter voluntarily returned with them to ADPS headquarters and participated in the Interview Video. ATF Task Force members later located Rick and Rodriquez Jackson; both men gave statements.

In February 2016, an Aiken County grand jury indicted Carter for first-degree burglary, kidnapping, possession of a weapon during the commission of a violent crime, and possession of a firearm by a person convicted of a violent felony. In February 2018, the grand jury indicted Carter for first-degree assault and battery and armed robbery.

Prior to his 2018 jury trial, Carter filed a motion in limine seeking redactions to the Interview Video. Carter specifically noted his objections to approximately eighty statements as inadmissible hearsay, improper burden-shifting, and prejudicial accusations by the interviewing officers that Carter was lying. The circuit court summarily denied Carter's motion. At trial, Carter further argued the Interview Video should be excluded because law enforcement's warrantless use of his cell phone to locate him the day of the shooting constituted an unconstitutional

warrantless search. The circuit court declined to rule on the issue at that time, noting it would wait to hear Agent Morlan's testimony. Carter renewed his objections to the Interview Video when the State sought to introduce it, but the circuit court overruled these objections and admitted the video with no redactions.

The jury acquitted Carter of first-degree assault and battery but found him guilty of first-degree burglary, kidnapping, armed robbery, possession of a firearm by a person convicted of a violent felony, and possession of a weapon during the commission of a violent crime. The circuit court sentenced him concurrently to a total of thirty-five years' imprisonment: thirty-five years for first-degree burglary, thirty years for kidnapping, thirty years for armed robbery, and five years for each firearms conviction.

## Standard of Review

Our supreme court recently refined our standard of review for considering trial court rulings addressing Fourth Amendment challenges. *See State v. Frasier*, Op. No. 28117 (S.C. Sup. Ct. filed Sept. 28, 2022) (Howard Adv. Sh. No. 35 at 12, 15–16). This appellate review involves a two-step inquiry: we review "the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion" is a question of law the appellate court reviews de novo. *Id*.

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion. *State v. Brewer*, 411 S.C. 401, 406, 768 S.E.2d 656, 658 (2015) (quoting *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012)).

## Law and Analysis

### I. Admission of the Interview Video

Carter argues the circuit court erred in admitting the Interview Video into evidence because it was gleaned from the warrantless use of Carter's CSLI in real time to track his location. We disagree.

In *Carpenter v. United States*, the United States Supreme Court found "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." 138 S. Ct. 2206, 2217 (2018). "Allowing government access to cell-site records contravenes that expectation." *Id*. "[E]ven though the Government will generally need a warrant to access CSLI,

case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances." *Id.* at 2222. "While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set forth does not limit their ability to respond to an ongoing emergency." *Id.* at 2223; *see also id.* at 2220 (noting the Court did not express a view on the collection of real-time CSLI). Moreover, "[t]he exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016). "Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Carpenter*, 138 S. Ct. at 2223.[5]

The exigent circumstances exception to the Fourth Amendment's prohibition of warrantless searches applies in this case, which involved a violent, home-invasion armed robbery, a sexual assault, the death of one of the intruders by gunshot wound to the head, and co-conspirators who remained at large. Neely, who admitted he participated in planning the robbery, gave law enforcement Carter's phone number and named him as a participant in the home invasion. ADPS Detective Jeremy Hembree completed the "exigent order" request for Carter's cell phone data from T-Mobile approximately five to six hours after the armed home invasion occurred. In this request, Detective Hembree described the situation:

> On 05/09/2015 the Aiken Department Public Safety responded to a home invasion in which shots were fired. Upon arrival a male was located with a gunshot wound to the head. The investigation has provided us with a telephone number for an unknown individual who was involved in the incident. The male located with the gunshot wound has since deceased as a result of the gunshot.

Detective Hembree testified it was not feasible to obtain a search warrant the morning of the investigation because the information gleaned from a warrant for historic cell records would not have provided Carter's real-time location; however, he explained he later obtained a search warrant for the contents of Carter's phone. Thus, this was not a standard criminal investigation seeking cell phone data; rather, this request sought to address an ongoing emergency because Carter was potentially armed and dangerous, had been involved in a violent crime only hours

---

[5] We note the "exigent order" request here pre-dated *Carpenter*.

prior to the request, and left his co-conspirator for dead when he fled Hahn Village. *Cf. Carpenter*, 138 S. Ct. at 2220 (holding law enforcement's obtaining of CSLI pursuant to the Stored Communications Act constituted an unreasonable search when officers obtained CSLI for a seven-day period as part of its investigation into nine robberies of cell phone stores over a period of four months and law enforcement used the CSLI to identify potential co-defendants).[6]  Accordingly, the circuit court properly declined to exclude the Interview Video on this basis.

## II.  Admission of Unredacted Interview Video

Carter next asserts the circuit court erred in admitting the Interview Video without requiring redaction of hearsay, accusations Carter was lying, and burden-shifting comments forbidden by *State v. Brewer*, 411 S.C. 401, 768 S.E.2d 656 (2015).  We agree.

In *Brewer*, our supreme court held the circuit court erred in admitting into evidence Brewer's unredacted interview with police.  *Id.* at 410, 768 S.E.2d at 660.  Brewer's trial involved multiple charges related to the shootings of two individuals at a nightclub.  *Id.* at 406, 768 S.E.2d at 657.  During the interview, investigators "frequently referenced *and quoted*" eyewitnesses and insisted "*ad nauseam*" that Brewer needed to prove his own innocence.  *Id.* at 406–08, 768 S.E.2d at 659.  While the supreme court acknowledged "the propriety of law enforcement interrogation techniques," it emphasized "such evidence will rarely be proper for a jury's consideration.  *Id.* at 406, 768 S.E.2d at 658–59.  Still, despite the "grave constitutional error" committed in admitting the unredacted interview, the court affirmed Brewer's convictions relating to one shooting due to the overwhelming evidence of Brewer's guilt; the court reversed as to a second shooting in another location where the evidence was less definitive.  *Id.* at 409–10, 768 S.E.2d at 659–60.

---

[6] Even if the exigent circumstances exception to the Fourth Amendment's warrant requirement did not apply here, Detective Hembree's warrantless application for Carter's real time cell location data would be protected by the good-faith exception to the Fourth Amendment's exclusionary rule.  *See, e.g.*, *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (considering a pre-*Carpenter* warrantless gathering of historical CSLI and finding "when investigators 'act with an objectively "reasonable good-faith belief" that their conduct is lawful,' the exclusionary rule will not apply").  Our ruling here is dispositive of Carter's challenge under the South Carolina Constitution's privacy clause as well.

This court addressed the application of *Brewer* in *State v. Washington*, finding the circuit court erred in admitting Washington's unredacted interview with police and noting *Brewer* removed any doubt about the recording's inadmissibility. 431 S.C. 619, 623, 848 S.E.2d 794, 796 (Ct. App. 2020). The court recognized the interrogation method "may have been a proper investigative technique"; however, "every word [the detective] uttered during the out of court interview was inadmissible hearsay." *Id*. at 622–23, 848 S.E.2d at 796. "The State highlighted the recorded interview in its closing arguments, and the jury later interrupted its deliberations to ask for a transcript of the interview." *Id.* at 625, 848 S.E.2d at 798. Thus, the *Washington* majority found the circuit court's error was not harmless because the case against Washington was circumstantial and was bolstered by the erroneously admitted interview. *Id.*

Carter filed a sixteen-page pretrial motion and memorandum in limine, seeking to suppress or redact the Interview Video. Carter's memorandum detailed numerous statements to which he objected, including inadmissible hearsay and comments by the interviewing officers challenging Carter's honesty. For example, the officers told Carter, we have "some of your people saying they were with you at 2 and 3 in the morning" and then asked him why these unidentified individuals would lie. This, like several other statements outlined in the memo, was hearsay. The officers also implied Carter was lying throughout the interview, with statements like "cut the [BS]," you "started lying to us right off the bat," "we're getting a lot of conflicting stuff from you man," and "this is like the 3rd or 4th layer" of lies. The officers recounted Carter's lies, asked him to start over with them but tell the truth, and commented Carter "started every lie with that statement, as a matter of fact."

In burden shifting, the officers told Carter, "You got to answer for what you did, the best thing you can do is say you know what guys?" before reminding Carter he could help himself by admitting guilt. Later, the officers told Carter, "You expect us to believe you weren't involved, even though we've got other things telling us that you were" and "we're just trying to give you an opportunity to say what happened to 'clear your conscience.'" While the statements outlined in Carter's memorandum were not so egregious as the repeated insistence in *Brewer* that the defendant prove his innocence, many were nevertheless inadmissible.

By email to counsel, the circuit court indicated it had considered Carter's motion and overruled *all* of the objections.[7]  Other than reiterating the brief ruling from the email, the record does not reflect that the circuit court analyzed the hearsay, burden-shifting, or other problematic references either pretrial or when Carter objected contemporaneously to the State's introduction of the Interview Video.  This was an abuse of discretion.  *See, e.g.*, *State v. King*, 424 S.C. 188, 199, 818 S.E.2d 204, 210 (2018) (reversing murder conviction where circuit court failed to provide any on-the-record explanation or analysis of its ruling before admitting unredacted recorded interview containing inadmissible reference to King's prior murder charge and evidence at trial was not overwhelming).

### III.  Harmless Error

"Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result."  *State v. Bryant*, 369 S.C. 511, 518, 633 S.E.2d 152, 156 (2006).  "The '[i]mproper admission of hearsay testimony constitutes reversible error only when the admission causes prejudice.'"  *Brewer*, 411 S.C. at 408, 768 S.E.2d at 660 (quoting *State v. Jennings*, 394 S.C. 473, 478, 716 S.E.2d 91, 93 (2011)).  "When guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached, the Court should not set aside a conviction because of insubstantial errors not affecting the result."  *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989).

A number of Carter's associates testified as to the chronology of events leading up to the home invasion armed robbery.  Additionally, Hammond, Carter's girlfriend, testified Carter told her he was involved in the home invasion as the driver of the vehicle and "the dude that was running it had got shot in the head."  Neely testified extensively about Carter's involvement in planning the robbery and admitted he gave Carter his gun to use that night.  Chandler observed Rick being dropped off at his Columbia Avenue house in a gray or silver car, and Carter had borrowed a gray or silver rental car from Whitney.  Whitney testified Rodriquez, another co-conspirator, was with Carter when he picked up and dropped off the car.

---

[7] This email was not included in the record on appeal, but prior to the start of trial, the circuit court stated, "Well, I think I sent y'all an email on that that I had reviewed the entire portion that you intend to admit during the trial of the case.  I have reviewed the objections made by [counsel] and the reasons set forth as outlined in his memo and I found, if I recall correctly, that I overruled all of the objections and advised y'all that I was going to let the interview up to that point that you cut it up be introduced."

ATF intelligence research specialist Regina Sailer's cell phone maps—along with Lieutenant Cameron's testimony explaining the historic cell phone records—corroborated Neely's testimony about Carter's whereabouts and the events leading up to the robbery. Although Carter's phone had no activity from 4:08 a.m. to 5:55 a.m., Lieutenant Cameron testified the cell phone mapping for that time period showed Carter was with Scruggs and Rick in the same approximate area of Augusta, Georgia, shortly before the robbery.

Additionally, the State presented evidence that Carter urged several witnesses to change their statements prior to trial. In jail phone calls between Hammond and Carter, Carter asked Hammond to change her statement to corroborate his claim that he was in bed with her all night, despite the fact that Hammond spoke to two police officers at the scene outside Miller's apartment, and Carter clearly was not with her. Carter also spoke on the phone with an unidentified female and asked her to tell the police that she saw him around 5:05 a.m. or 5:10 a.m., although he had previously asked her to tell police he was with her from 4:00 a.m. to 6:48 a.m.. Carter told the unidentified female to talk to Whitney about changing her statement, saying, "you and her try to come up with a g****mn [inaudible] so she can tell them people something else instead of g*****mn that I came and picked her up." Carter elaborated, "Tell her to change her statement so her statement can't be credible, you know what I'm saying?" Carter said Whitney needed to tell the police he came to pick her up, but he was alone, they never went to his cousin's apartment, and someone else borrowed her rental car that night.

In light of the overwhelming evidence of Carter's guilt, we find the circuit court's admission of the unredacted Interview Video was harmless beyond a reasonable doubt. *See Brewer*, 411 S.C. at 409, 768 S.E.2d at 660 (finding admission of interviewers' inadmissible statements harmless beyond a reasonable doubt where several witnesses testified they saw Brewer shooting inside the Club and "[b]y all accounts, there was only one shooter inside the Club—Brewer").

**Conclusion**

For these reasons, Carter's convictions are

**AFFIRMED.**

**KONDUROS, J., and LOCKEMY, A.J., concur.**